[No. A050819. First Dist., Div. Two. Mar. 20, 1992.]

CONTRA COSTA WATER DISTRICT, Plaintiff and Respondent, v. BAR-C PROPERTIES et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III, IV and V.

**COUNSEL**

McCloskey & Kays, Paul N. McCloskey, Jr., and David A. Kays for Defendants and Appellants.

Bold & Polisner, Carl P. A. Nelson and Jeffrey D. Polisner for Plaintiff and Respondent.

**OPINION**

**SMITH, J.**—In this eminent domain action, a jury awarded defendants Bar-C Properties, Steven A. Capozzo and Victor Barulich (collectively Bar-C), $312,000 as compensation for the taking by plaintiff Contra Costa Water District of 43.56 acres of unimproved real property belonging to Bar-C.

Bar-C appeals from the ensuing judgment, alleging improper exclusion of the testimony of some of its witnesses, abuse of discretion in excluding

small lot sales as comparables, and other assertedly erroneous evidentiary rulings. We affirm.

## BACKGROUND

In 1988 (further unspecified dates are to that calendar year), defendant and appellant Steven Capozzo, who was looking to buy a five- to ten-acre ranchette parcel in eastern Contra Costa County, located an irregularly shaped parcel of one hundred fifteen acres of rolling hillside land, some four miles west of Byron. The property, known as the Silver Hills Ranch, had been listed for sale by its owner, Wes Craven, for over a year at $775,000. Capozzo and his partner Victor Barulich with whom he formed Bar-C Properties, entered into a contract to buy the Craven property for $737,500, contingent upon the buyers obtaining county approval of a 10-lot subdivision map. Bar-C immediately proceeded to take steps to obtain subdivision approval. However, on November 11, Capozzo received a certified letter from the Contra Costa Water District (District) stating its intent to acquire a portion of the property for its Los Vaqueros Reservoir project. On November 14, the East County Planning Commission approved Bar-C's application for a tentative map for a 10-lot subdivision. On December 11, escrow closed and Bar-C took title to the Silver Hills property.

On February 9, 1989, the California Department of Real Estate issued a "pink sheet" or a preliminary public report on Bar-C's proposed subdivision. The issuance of a pink sheet enables the owner to accept reservation deposits, but not to enter into any negotiations for the sale or lease of individual lots.

Eight days after issuance of the pink sheet, the District commenced this action to condemn 43.5 acres of Bar-C's 115-acre Silver Hills property. The action caused Bar-C to reconfigure the subdivision into six remaining lots.

In February 1990, after obtaining subdivision of the remaining parcel into lots, Bar-C contracted to sell one of the lots, a 12.5-acre homesite lot to Raymond Gallagher for $390,000 (Gallagher sale).

## TRIAL

The matter proceeded to a jury trial on April 23, 1990. The District brought a motion *in limine* to exclude the valuation testimony of Bar-C expert Hal Bolla. In deposition, Bolla revealed that his opinion on value was based exclusively on what is commonly known as the "developer's approach." This method starts from the assumption of a completed subdivision, deducts the development expenses, costs of completion and expected profit

to reach a residual land value for each individual lot anticipated to be sold and adds them together to arrive at a market value for the entire property. The court ruled that this approach to value was improper under California law and granted the District's *in limine* motion.[1]

The court also refused to permit either of the owners to give his opinion of value on grounds that they too used the developer's approach. None of Bar-C's witnesses were allowed to testify as to alternate valuation methods, since such methods were not disclosed during pretrial discovery.

· The court overruled the District's objection to the testimony of Bar-C's expert Lewis Plummer. Plummer, a local real estate agent, testified that the demand for 5- to-20 acre ranchette parcels has been "phenomenal"; that in his experience the filing of a subdivision map will increase the value of a parcel 2½ to 4 times, and that, based on his analysis of 30 to 35 comparable parcels, he valued the 43-acre parcel taken by the District at $1,560,000.

Bar-C attempted to preclude the valuation testimony of District appraiser Donald Ashley on the ground that he, like Bolla, employed an impermissible "per lot" technique as the basis for his opinion. Accepting the District's position that Ashley had not used an unlawful approach, the court overruled the objection. Ashley then testified that the value of the "take" in February 1989 was $312,000. He divided the Silver Hills property into ten "raw lots" based on its potential for subdivision; computed a per-raw-lot value of $73,750 (based primarily on the purchase price for the entire parcel); added on amounts for appreciation, profit and enhanced value due to the developer's efforts and arrived at a raw lot land value of $78,000 per lot, which he multiplied by four to account for the four lots taken. Ashley stated that in reaching his opinion, he looked at sales of acreage in various stages of the subdivision process.

In addition to precluding all testimony of value based on the developer's approach, the trial court also excluded from the jury's consideration several of Bar-C's purported comparable sales of five- to ten-acre finished ranchette lots in the county on the grounds that they were not sufficiently similar to the parcel being taken and that the potential for prejudice outweighed their probative value.

---

[1]Bolla was eventually permitted to testify on the issue of severance damages.

The jury returned with a verdict which found the value of land taken to be $312,000, thereby implicitly accepting Ashley's valuation testimony and rejecting Plummer's.[2]

APPEAL

I

*Exclusion of the "Developer's Approach"*

At the commencement of trial, the trial court granted a motion *in limine* excluding from evidence the opinion testimony of Bar-C's chief appraiser Hal Bolla. Discovery revealed that while Bolla purportedly used a "comparable sales" approach, he did not consider any sales of large parcels approximating the 43.5 acres of condemned property. Instead, he viewed the District as having effectively taken four individual lots of a ten-lot subdivision, and appraised the "per lot" value of the Silver Hills property by looking at twenty or so sales of small finished lots, mostly five acres in size, which were selling for $250,000-$375,000 each. After arriving at a value of $3.1 million for all 10 lots, Bolla allocated a portion of that figure to the 4 lots taken. Since the comparable sales he used were finished homesites as opposed to undeveloped land, Bolla then worked backward by subtracting costs of development, profit, etc, which yielded a total of $1.2 million as the net value of the four lots.[3] Ironically, Bolla himself acknowledged in his deposition that his method was "improper under California law," while at the same time conceding that it was the only approach he used.

Bolla's technique, commonly referred to during the trial as the "developer's approach," was also used by Silver Hills owners Capozzo and Barulich.

■ The developer's approach (also known as the "economic analysis" or "residual land value" approach) as a method for measuring the fair market value of undeveloped land has been repeatedly held inadmissible by California courts. While it is recognized that the suitability of condemned acreage for development as a subdivision is a *factor* which may properly be *considered* in determining fair market value, our courts have held that "it is not proper to place a valuation upon property which is suitable for subdivision taking the market value of contemplated lots and subtracting therefrom the cost of subdivision." (*Buena Park School Dist.* v. *Metrim Corp.* (1959) 176

[2]The jury also found, in conformance with Ashley's testimony, that Bar-C suffered $49,000 in severance damages and that special benefits to the remaining parcel amounted to $40,266. These adjustments produced a total compensation award of $320,734.

[3]By the time of the motion *in limine*, Bolla had made additional computations, resulting in a revised figure of $936,000.

Cal.App.2d 255, 260 [1 Cal.Rptr. 250], citing *City of Los Angeles* v. *Hughes* (1927) 202 Cal. 731, 734-735 [262 P. 737].) Stated another way "evidence of value in terms of the money which the land would bring for a specific purpose or as a result of a projected specific plan of development is not admissible as an element in determining such market value." (*People* ex rel. Dept. Pub. Wks. v. *Silveira* (1965) 236 Cal.App.2d 604, 627 [46 Cal.Rptr. 260]; accord *In re Marriage of Folb* (1975) 53 Cal.App.3d 862, 869 [126 Cal.Rptr. 306]; *Santa Clara County Flood Control & Water Conservation Dist.* v. *Freitas* (1960) 177 Cal.App.2d 264, 267 [2 Cal.Rptr. 129].)

The rationale for this rule is that the expenses of completing the subdivision, improving the land, laying out streets, holding it and paying out taxes and interest until the lots are sold are far too uncertain and conjectural to allow finished subdivided lot prices to be used as a basis for computing value. (See 4 Nichols, Eminent Domain (3d ed. 1992 supp.) § 12B.14, pp. 12B-137–12B-187.) As one court put it "[s]uch evidence opens wide the door to unlimited vagaries and speculations concerning problematical prices which might under possible contingencies be paid for the land, and distracts the mind of the jury from the single question—that of market value—the highest sum which the property is worth to persons generally, purchasing in the open market in consideration of the land's adaptability for any proven use. [Citations.]" (Internal quotation marks omitted.) (*City of Pleasant Hill* v. *First Baptist Church* (1969) 1 Cal.App.3d 384, 399 [82 Cal.Rptr. 1].)

■   Bar-C argues that this case should not be subject to application of the foregoing rules because it had obtained tentative map approval from the county and a "pink sheet," i.e., a preliminary public report from the California Department of Real Estate, allowing deposits to be taken on individual lots. Because it had passed this "important step in the subdivision process," Bar-C maintains that subdivision and eventual sale of individual lots was not merely speculative or conjectural, but a real probability at the time the condemnation action was commenced.

We reject this contention. In *Buena Park School Dist.* v. *Metrim Corp., supra,* 176 Cal.App.2d 255, the developer was farther along in the subdivision process than Bar-C was here: there, not only had a tentative map been approved but an adjacent golf course was well on the way toward completion, the property had been surveyed, the engineering work was done and a considerable amount of grading was completed; the property had been marked out into lots and some streets were ready for paving; and utilities, sewer and water lines had been brought to the edge of the property. (*Id.* at p. 258.) Nevertheless, the court found that while sales of comparable subdi-

vided lots were admissible "for the purpose of throwing such light as it could upon the price which a purchaser would pay" for the property, measuring market value by using sale prices of completely improved lots and then subtracting the cost of subdivision was an "erroneous theory of value" and should have been stricken upon proper objection (*id.* at p. 262). After reviewing the applicable principles, the *Metrim* court stated, "[I]t is apparent that the value of the condemned property was not, strictly speaking, the value of the 37 lots when ready for sale to parties seeking to build the residences, less the cost of completing the subdivision. The market value was the value of the property in the condition it was at the time of valuation, taking into consideration all of those things which a purchaser would properly consider." (*Id.* at p. 260.) If the developer's theory was considered an inappropriate measure of damages in *Metrim* where work on the subdivision was partially complete and work well under way, the error of using it here where no work had been done and subdivision into saleable lots had not yet become a reality, is manifest.

We disagree with Bar-C's position that approval of a tentative subdivision map and issuance of a "pink sheet" meant that the process had sufficiently crossed the threshold toward the sale of finished lots as to render the developer's approach an acceptable method of valuation. While the approval of a tentative map "locks in" the codes and ordinances in effect at the time of such approval (Gov. Code, § 66498.1), there are a host of legal and financial hurdles to overcome before individual lots are ready to sell. (See 7 Miller & Starr, California Real Estate (2d ed. 1990) § 20:138, p. 394.) Nor is the issuance of a "pink sheet" of great significance, for until the Department of Real Estate issues its final public report, the developer has no assurance that his subdivision will be approved or that individual lot sales will occur. (7 Miller & Starr, *op. cit. supra*, § 20:23, pp. 52-52; Bus. & Prof. Code, § 11018.2.)[4]

The case of *Napa Union High School Dist.* v. *Lewis* (1958) 158 Cal.App.2d 69 [322 P.2d 39] is not, as Bar-C claims, "directly on point." There, appraisers for both sides used the developer's approach, but there was no objection below and no assignment of error on appeal. The judgment was

---

[4]The contingent nature of obtaining a pink sheet is best expressed by the report itself. Under the heading "Consumer Information," the report starts out by stating:

"GENERAL INFORMATION [¶] • This report is not an approval or disapproval of this subdivision. [¶] • This report is for your information only and the information included may change substantially in the future. [¶] • Under this Preliminary Public Report, seller is authorized only to advertise and take reservations. [¶] • The seller may not negotiate the sale or lease of lots or units with you until a FINAL PUBLIC REPORT has been issued by the Department of Real Estate (DRE). [¶] *You have no assurance that this subdivision or promised improvements will ever be completed or will ever comply with DRE requirements.*" (Italics added.)

reversed because the trial court selected an erroneous method of calculating subdivision costs (estimating the cost of improving only the condemned parcel instead of spreading the expenses out over the whole parcel and apportioning the cost between the land taken and the land left intact) and ordered the jury to use that method instead of the correct procedure proposed by appellants. (*Id.* at pp. 72-73.) The court did not discuss the propriety of using the developer's approach or comment upon under what circumstances it might be permissible. Opinions are not authority for issues they do not consider. (*Palmer* v. *Ted Stevens Honda, Inc.* (1987) 193 Cal.App.3d 530, 539 [238 Cal.Rptr. 363].)

We are similarly unpersuaded by Bar-C's reliance on two related 1972 federal cases, which Bar-C cites for the first time in its reply brief (*United States* v. *100 Acres of Land, etc., Marin City, Cal.* (9th Cir. 1972) 468 F.2d 1261; *Drakes Bay Land Company* v. *United States* (1972) 198 Ct.Cl. 506 [459 F.2d 504]). Although the court upheld use of the economic analysis approach, the subdivision in those cases was "part of a recreational and residential development *in progress* on the entire acreage [and] some preparatory physical work had already been completed." "Even though the subject property was largely unimproved, it was *an integral part of a subdivision being developed and was the next unit to be completed.*" (*United States* v. *100 Acres of Land, etc., Marin City, Cal.*, *supra*, 468 F.2d 1261, 1266, italics added.) Those circumstances are far different than what we have here. In any event, whatever limited acceptance the theory may have achieved under federal eminent domain law, it has not yet merited such recognition in California and we refrain from adopting it under the circumstances here.

█ "In condemnation proceedings, the trial court is vested with considerable judicial discretion in admitting or rejecting evidence of value. [Citation]" (*Redevelopment Agency* v. *Contra Costa Theatre, Inc.* (1982) 135 Cal.App.3d 73, 86 [185 Cal.Rptr. 159].) The trial court did not abuse its discretion in preventing Bolla from testifying as to the "developer's approach" to value.

II

*Preclusion of Owners' Valuation Testimony*

█ Bar-C also claims it was error for the trial court to have precluded the testimony of owners Barulich and Capozzo as to the value of the property taken, citing the maxim that an owner is always qualified to testify

to the value of his own property. (Evid. Code, § 813, subd. (a)(2); *City of Fresno* v. *Hedstrom* (1951) 103 Cal.App.2d 453, 461 [229 P.2d 809].) Regardless of whether it rightly or wrongly determined that the owners had used an impermissible approach to value, Bar-C argues, the trial court had no right to prevent them from presenting their opinion to the jury.[5] This argument is not well taken.

The generally recognized right of an owner to testify is not absolute. In stating an opinion as to the value of property, an owner is bound by the same rules of admissibility as any other witness. (*City of Gilroy* v. *Filice* (1963) 221 Cal.App.2d 259, 268 [34 Cal.Rptr. 368]; *Kitchel* v. *Acree* (1963) 216 Cal.App.2d 119, 124 [30 Cal.Rptr. 714]; *People* v. *La Macchia* (1953) 41 Cal.2d 738, 747 [264 P.2d 15].) To allow a witness's statement of reasons for his opinion to be used as a vehicle for bringing before the jury incompetent evidence would " 'create a disastrous break in the dike which stands against a flood of interminable investigation.' " (*Kitchel* v. *Acree, supra,* 216 Cal.App.2d 119, 125, quoting *People* v. *La Macchia, supra,* 41 Cal.2d at pp. 745-746.) ■ The trial court properly prevented the owners from bringing an inadmissible methodology before the jury under the guise of giving their opinion as to value. (See *Sacramento & San Joaquin Drainage Dist.* v. *Goehring* (1970) 13 Cal.App.3d 58, 65-66 [91 Cal.Rptr. 375]; *People* ex rel. *Dept. Water Resources* v. *Brown* (1967) 255 Cal.App.2d 597, 601 [63 Cal.Rptr. 363].)[6]

III-V*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[5]It should be noted that Capozzo was allowed to testify extensively as to all other areas of inquiry. The record does not show any attempt to have Barulich testify on matters other than an opinion as to value.

[6]We also reject Bar-C's contention that it was an abuse of discretion for the trial judge to have refused to allow either the experts or owners to testify as to a valuation of the property based on some method other than the developer's approach.

Both owners made clear during pretrial discovery that their exclusive approach to value was to start with finished lot sales and work backward, and Bolla stated that he had not been asked to utilize any other approach. Under Code of Civil Procedure sections 1258.240 through 1258.260, Bar-C was required not only to exchange witness lists, but to describe the proposed valuation testimony, including the specifics of all supporting factors upon which its experts relied. (*City of Fresno* v. *Harrison* (1984) 154 Cal.App.3d 296, 303 [201 Cal.Rptr. 219].) The trial court acted properly in refusing to allow Bar-C to develop new approaches to value in the middle of trial which had not been disclosed to the District during pretrial discovery. (*Id.,* at pp. 301-303.)

*See footnote, *ante,* page 652.

## DISPOSITION

Judgment affirmed.

Kline, P. J., and Peterson, J., concurred.