[No. B183532. Second Dist., Div. Six. Jan. 30, 2008.]

COUNTY OF VENTURA, Plaintiff and Appellant, v.
CHANNEL ISLANDS MARINA, INC., Defendant and Respondent.

## COUNSEL

Noel A. Klebaum, County Counsel, Roberto R. Orellana, Assistant County Counsel; Demetriou, Del Guercio, Springer & Francis, Jeffrey Z. B. Springer, John E. Mackel III, Isabel Birrueta; Greines, Martin, Stein & Richland and Timothy T. Coates for Plaintiff and Appellant.

Ferguson, Case, Orr, Paterson & Cunningham, Michael W. Case and Douglas E. Kupler for Defendant and Respondent.

## OPINION

**GILBERT, P. J.**—Bad behavior does not establish damages: causation does. Taking claims do not arise from a breach of contract.

With these two principles in mind, we discuss this case concerning a dispute over leasehold improvements installed by a private party on land leased from the County of Ventura (County). At the end of the lease term, County sued the lessee to prevent it from removing the improvements. The lessee cross-complained for breach of lease and inverse condemnation. The trial court found that County took the lessee's property and breached the lease by not consenting to removal of the improvements. But the court also found that had County consented, California Coastal Commission regulations would have prevented removal of the improvements.

Nevertheless, the trial court submitted the question of damages to the jury based on inverse condemnation and instructed the jury to value the improvements in place. The jury returned a verdict against County for $3.5 million.

We conclude that inverse condemnation is not an appropriate theory of recovery where the wrong is nothing more than a breach of lease. We also conclude that under any other theory of recovery, in-place value is not an appropriate measure of damages where the lease has ended. Here, the California Coastal Commission regulations, not County, were the cause of any loss suffered by the lessee. We reverse.

### FACTS

Channel Islands Harbor (harbor) is located in the City of Oxnard and is owned by the County of Ventura.

On April 30, 1963, County entered into a lease (the ground lease) with Channel Islands Marina, Inc. (CIM), to construct and operate a marina at the harbor. The duration of the ground lease was for 40 years and expired on April 30, 2003. There were no improvements on the real property when the lease was executed.

Pursuant to the terms of the ground lease, CIM constructed both waterside and landside improvements, which include numerous boat slips and three buildings. CIM subleased the individual slips to boat owners.

Article 19 of the ground lease governs the removal of improvements. Paragraph (a) provides that CIM is required to remove the improvements within 60 days after expiration of the lease and return the property to its original condition. Under paragraph (b), County may negotiate purchase of the improvements. If County declares that an agreement cannot be reached, CIM must remove the improvements within 60 days of the declaration. Pursuant to paragraph (c), if CIM fails to remove the improvements within the prescribed time period, title to the improvements vests in County and CIM must pay for the cost of "removal, sale or destruction."[1]

In late 1998, CIM sought to renegotiate the ground lease. By 2002, the parties reached an impasse.

In December 2002, counsel for CIM, Michael Case, wrote to Lyn Krieger, the harbor director, outlining the parties' impasse. Case challenged Krieger's allegation that County only need pay CIM salvage value for the improvements. It was Case's opinion that County was required to pay fair market value. Case stated that, if the matter could not be resolved, CIM would notify the live-aboards by January 2003 that their leases would expire in March.

On January 5, 2003, CIM sent 60-day eviction notices to the live-aboards, directing them to move so demolition could begin. Several weeks later, CIM offered to sell the improvements to County for $3.2 million.

CIM notified Krieger by letter that it would investigate the processes for acquiring the necessary permits, should it become necessary to remove the

---

[1] Article 19 of the ground lease states: "REMOVAL OF IMPROVEMENTS[:] [¶] (a) At the expiration, termination or cancellation of the lease, the Lessee shall within sixty (60) days, at his own expense, remove all improvements and installations of any kind owned or placed on the premises by the Lessee, and all debris, surplus and salvage materials, and shall leave the leased premises in substantially the same condition as when first occupied by the Lessee; however, [¶] (b) The County may elect whether or not it will negotiate to acquire the Lessee's improvements and installations, or any part thereof, under considerations mutually agreeable to the County and the Lessee at the time of expiration, termination or cancellation. In the event the County elects to acquire, but agreement on terms for acquisition is not achieved within a reasonable period, the County shall declare the absence of agreement, and such declaration shall be final, and the improvements and installations shall be removed as provided in Paragraph (a) of this Article and within sixty (60) days of such declaration. [¶] (c) In the event the Lessee does not remove or has not completed removal of his improvements and installations as provided by this article title thereto shall vest in County. County may remove or cause to be removed or sold or destroyed the improvements and installations on the leased premises and the Lessee shall pay to the County the reasonable and actual cost of any such removal, sale or destruction. [¶] (d) In the event the County's policy relating to leases of forty (40) years or more and concerning removal of improvements as set forth in this Article 19 should change, County or lessee may request that the provisions of this Article 19 be reviewed."

improvements. CIM indicated that, if lease negotiations were unsuccessful, it would begin terminating its subleases on May 2, 2003.

On April 18, 2003, County offered to purchase the improvements for $50,000. CIM rejected County's offer. CIM's appraiser valued the improvements at $3.5 million; County's appraiser submitted a value under $50,000.

### County's Complaint

On April 22, 2003, County filed an action against CIM and applied for a preliminary injunction and temporary restraining order enjoining CIM from evicting tenants and removing leasehold improvements. The trial court denied County's request for injunctive relief.

In its first amended complaint (filed June 24, 2003), County asserted causes of action for breach of the ground lease, public nuisance, and declaratory relief, seeking reentry and damages. It claimed that CIM breached the ground lease by issuing the notices of termination. County contended that CIM had not obtained the legally required permits to demolish the waterside improvements (such as docks and slips), nor was it likely to obtain the permits within the time period required under the lease. County stated that the required permits included a coastal development (CD) permit from the California Coastal Commission (Coastal Commission) as well as approval from the Regional Water Quality Control Board, the County of Ventura, the United States Army Corps of Engineers, and the California Department of Fish and Game.

In order to remove the landside improvements (restrooms, gates and yacht club building), County alleged that CIM had to obtain a CD permit containing a "finding of consistency"—a finding that the demolition was consistent with the harbor's public works plan. The CD permit had to be obtained from County and certified by the Coastal Commission. Only then could the City of Oxnard issue a demolition permit.

County alleged that it was unlikely that any permit to demolish the slips would comply with the California Coastal Act of 1976 (Coastal Act; Pub. Resources Code, § 30000 et seq.) unless accompanied by a plan for their replacement. It also claimed demolitions would be subject to environmental review. It further alleged that CIM had no legal right or ability to remove the improvements, or a reasonable probability of obtaining such permission. Moreover, no plans had been submitted to the harbor director for approval, as required by the lease.

County claimed that CIM's "threatened terminations, mass evictions and demolition" could cause irreparable injury to the tenants, to public coastal access and recreational boating, given the difficulty in relocating the large number of vessels. The mass evictions posed a danger to safe navigation and waterway conditions and would cause economic harm to businesses that provide services to the marina's occupants.

### CIM's Cross-complaint

In mid-June 2003, while the litigation was pending, CIM issued 60-day notices to quit to the live-aboards and indicated that 30-day notices would be issued to non-live-aboards in July 2003. CIM subsequently reevaluated its position and concluded it could not obtain the required permits and that further attempts were futile. It withdrew or abandoned the various permit applications. On July 21, 2003, CIM sent letters to the live-aboards retracting the notices of termination.

On July 22, 2003, CIM filed an answer to County's first amended complaint and cross-complained for breach of contract, inverse condemnation, conversion, constructive trust and declaratory relief. It sought $3.5 million damages, representing the fair market value of the improvements. The cause of action for conversion was later dismissed because it was barred by governmental immunity.

CIM acknowledged that the ground lease was entered into before adoption of the Coastal Act and the creation of the Coastal Commission. It stated that the requirements imposed under the Coastal Act made the demolition or removal of the improvements substantially more expensive and time consuming than originally contemplated by the parties.

CIM recited that the City of Oxnard had issued a demolition permit for the three buildings. The city, however, later rescinded the permit and informed CIM that it would be required to submit a site plan and obtain permission from, among others, the Coastal Commission and County. CIM argued that obtaining County's permission was futile, since County has already taken the position that CIM had no right to remove improvements, irrespective of whether permits were granted.

CIM alleged that County had breached the express terms of the contract and an implied covenant of good faith and fair dealing. It claimed that

County had made removal of the improvements impossible, which constituted a taking of CIM's property, entitling it to just compensation pursuant to article I, section 19 of the California Constitution. CIM asserted that County acquired the improvements for County's gain, so that it could operate the marina without having to invest capital expenses to construct its own improvements.

On August 1, 2003, County declared an "absence of agreement." After the ground lease expired on August 31, 2003, County took possession of the improvements without payment. It leased the property to Vintage Marina Partners LP (Vintage), who began operating the marina in January 2004.

## PROCEDURE

### Trial—Phase I—Statement of Decision

By stipulation, the parties submitted liability issues to the court. Following phase I of the trial, the court issued a statement of decision. It stated that "County's refusals to consent or permit [the demolition], the requirements of the Coastal Act, the [Army Corps of Engineers'] new requirements, the adoption of the Harbor's Public Works Plan" and the formation of the Coastal Commission requirements neither existed nor were foreseen. According to the testimony of Tom Volk, who was the harbor director when the lease was negotiated, only a demolition permit was contemplated when the ground lease was executed in 1963.

The trial court found that County did not fulfill its duty to cooperate so that both parties could perform as contemplated by the ground lease. It interfered with CIM's attempts to remove the improvements by denying that CIM owned them and had a right to remove them, which was directly contrary to the lease provisions. County withheld its permission for removal; discouraged the cooperation of the City of Oxnard; and actively sought to obtain title to the improvements without paying for them. The court concluded that County had taken the improvements without paying for them, and breached the implied covenant of good faith and fair dealing in the ground lease.

The trial court also found, however, that "[e]ven had [County consented to CIM's applications to permitting authorities], the evidence established . . . that the Coastal Commission *would not have issued a coastal development permit without a replacement plan, which CIM was clearly in no condition to satisfy.*" (Italics added.)

## No Breach of Contract

The court rejected County's contention that CIM had breached the ground lease by serving notices of termination on the subtenants. The court noted that CIM was entitled under the ground lease to remove the improvements, and terminating the subleases was a necessary prerequisite.

## Declaratory Relief

The court found that CIM owned the improvements; that it had the right to remove them at lease expiration, pursuant to article 19 of the ground lease; and that CIM was entitled to compensation for County's use of the improvements.

## Damages

The court ruled that damages would be decided at the second phase of the trial. It said that CIM could not recover damages for both breach of contract and inverse condemnation, and must make a selection. Because the improvements are difficult to value, the court requested the parties to consider a "just and equitable" method of evaluation. (Code Civ. Proc., § 1263.320, subd. (b).)[2]

## Trial—Phase II

At the second phase of trial, CIM elected to recover damages under an inverse condemnation theory. After conferring with counsel, the court instructed the jury to determine the fair market value of the improvements as of September 1, 2003, taking into account their useful life. The compensation was to be based on the "in place" value of the improvements without considering the time remaining on the CIM lease.[3]

---

[2] "The fair market value of property taken for which there is no relevant, comparable market is its value on the date of valuation as determined by any method of valuation that is just and equitable." (Code Civ. Proc., § 1263.320, subd. (b).)

[3] The jury was instructed, "Do not consider any personal value of the leasehold improvements to Channel Islands Marina, Inc. or its need for the leasehold improvements. Also, do not consider the particular need of the County of Ventura for the leasehold improvements. [¶] The compensation for the leasehold improvements in this case is to be based on their 'in place' value, without any limitation to the time remaining on the former lease between Channel Islands Marina, Inc. and the County or any other lease. [¶] In determining the fair market value of the leasehold improvements on September 1, 2003, you are to consider the useful life of the leasehold improvements. [¶] In determining the fair market value of the leasehold improvements taken, you should not include any increase or decrease in the value of the leasehold improvements that is attributable to the project for which the property was taken."

County's expert valued the fair market value of the improvements at $800,000. CIM offered expert testimony valuing the improvements at $4.3 million, assuming a 10-year useful life, or $3.1 million assuming a seven-year useful life.

The jury awarded CIM $3.5 million damages. County filed a motion for a new trial, which the trial court denied. It awarded CIM attorney's fees of $729,800.

## DISCUSSION

### I

County contends there can be no inverse condemnation arising from breach of a contract or lease.

■ The United States Constitution prohibits the taking of property for public use without just compensation. (U.S. Const., 5th Amend.) The California Constitution requires compensation when property is "taken or damaged for public use . . . ." (Cal. Const., art. I, § 19.) Because the California Constitution requires compensation for damage as well as a taking, the California clause " 'protects a somewhat broader range of property values' than does the corresponding federal provision. [Citations.]" (*San Remo Hotel v. City and County of San Francisco* (2002) 27 Cal.4th 643, 664 [117 Cal.Rptr.2d 269, 41 P.3d 87], quoting *Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 9, fn. 4 [32 Cal.Rptr.2d 244, 876 P.2d 1043].) Aside from that difference, California courts have construed the clauses congruently. (*San Remo Hotel*, at p. 664.) Thus courts have analyzed takings claims under decisions of both the California and United States Supreme Courts. (*Ibid.*)

■ Federal courts refuse to recognize takings claims where the property taken arises from contract or lease. Thus in *Marathon Oil Co. v. U.S.* (1989) 16 Cl. Ct. 332, 339, the court rejected a takings claim arising from disputed royalties under a lease agreement on the theory that there can be no taking "since plaintiff's rights, if any, are circumscribed by the lease and regulations." (See also *Castle v. U.S.* (Fed. Cir. 2002) 301 F.3d 1328, 1342 [breach of contract is not a taking because "plaintiffs retained the full range of remedies associated with any contractual property right they possessed"].)

■ CIM argues that federal courts allow takings claims to vindicate rights that exist independently of the contract at issue. (Citing *Scan-Tech Security, L.P. v. U.S.* (2000) 46 Fed.Cl. 326, 342 [court refused to dismiss takings claim at pleading stage where court could not determine what rights are covered by contract].) It is true the lease gave CIM the right to remove

improvements if County chose not to purchase them. But CIM cites no authority for the proposition that the right to remove improvements exists independently of the lease. In the absence of an agreement to the contrary, when a person affixes his property to the land of another, the thing affixed belongs to the owner of the land. (See Civ. Code, § 1013.)

The federal cases persuade us that CIM has no cause of action in inverse condemnation. The rights and duties of the parties spring from the lease. So, too, liabilities arising from breach of the lease are creatures of the agreement. There is no reason to impose extracontractual liability for breach, simply because the breaching party is a governmental entity. To say that a breach of contract or lease implicates the Fifth Amendment to the United States Constitution or article I, section 19 of the California Constitution, stretches the meaning of those provisions well beyond reason.

CIM's reliance on California cases is misplaced. In *Albers v. County of Los Angeles* (1965) 62 Cal.2d 250 [42 Cal.Rptr. 89, 398 P.2d 129] (*Albers*), the county was granted an easement by landowner-developers to construct a road. With the consent of the developers, the county placed 175,000 cubic yards of dirt on the easement and on either side of the easement. The dirt caused a massive landslide that affected not only the developers' property, but neighboring property as well. The developers and other property owners sued for negligence, nuisance, trespass and inverse condemnation. The trial court found no liability for negligence, nuisance or trespass, but awarded damages for inverse condemnation.

On appeal the county argued it should not be liable for inverse condemnation where, under the same facts, there would be no cause of action against a private party. Our Supreme Court rejected the argument under the "or damaged" provision of the California Constitution. The court concluded "any actual physical injury to real property proximately caused by [a public improvement] as deliberately designed and constructed is compensable under article I, section 14, of our Constitution . . . ." (*Albers, supra,* 62 Cal.2d at pp. 263–264.)

The Supreme Court also rejected the county's argument that the developers were estopped from recovering damages due to their grant of an easement and consent to the placement of the dirt. The court stated the developers were not estopped to claim inverse condemnation damages that were not reasonably foreseeable. (*Albers, supra,* 62 Cal.2d at p. 265.) Such damages are not within the scope of the developers' consent. (*Ibid.*)

In *Reinking v. County of Orange* (1970) 9 Cal.App.3d 1024 [88 Cal.Rptr. 695] (*Reinking*), the county leased property from the plaintiff for use as a landfill.

After the lease terminated, the plaintiff discovered subsidence, and sued in inverse condemnation. The trial court found the county did not breach the lease, and that the subsidence was not foreseeable. It also found, however, that the subsidence was proximately caused by the design and operation of the landfill as a public improvement. Relying on *Albers*, the Court of Appeal determined that the county was liable under the "or damaged" clause to the extent the damage was unforeseeable. (*Reinking, supra*, at p. 1030.)

Both *Albers* and *Reinking* were decided under the "or damaged" provision of the California Constitution. Both cases involve physical injury to property. Indeed, the holding in *Albers*, on which *Reinking* relies, is limited to "actual physical injury." (*Albers, supra*, 62 Cal.2d at p. 263; see also *Belair v. Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550, 558 [253 Cal.Rptr. 693, 764 P.2d 1070] [confirming *Albers* is limited to actual physical injury].) Here County did not physically injure CIM's property. Moreover, in *Albers* and *Reinking*, the damage was to the underlying fee. The plaintiffs' interest as owners of the underlying fees exist independently of the lease agreements. *Albers* and *Reinking* are like those federal cases that allow takings claims to vindicate rights that exist independently of the contract.

Similarly, in *Mehl v. People ex rel. Dept. Pub. Wks.* (1975) 13 Cal.3d 710 [119 Cal.Rptr. 625, 532 P.2d 489], Mehl unsuccessfully sued the state in inverse condemnation when the construction of a freeway on neighboring property diverted runoff water onto his land. Mehl's property rights arose from his fee interest in his land. Inverse condemnation was his only recourse. Unlike this case, Mehl was not suing in inverse condemnation for what is essentially a breach of lease. Mehl's interest in his land was independent of any agreement with a governmental entity.

In *City of Needles v. Griswold* (1992) 6 Cal.App.4th 1881, 1888 [8 Cal.Rptr.2d 753], the city did not contest that the plaintiff had the right to bring an inverse condemnation action. Thus the court did not discuss whether the plaintiff had that right. The only question was whether the city had to pay prior to or concurrently with the taking. A case is not authority for matters not discussed therein. (*Contra Costa Water Dist. v. Bar-C Properties* (1992) 5 Cal.App.4th 652, 660 [7 Cal.Rptr.2d 91].)

Similarly, in *Smart v. City of Los Angeles* (1980) 112 Cal.App.3d 232, 239 [169 Cal.Rptr. 174], the city argued the plaintiff could not recover on a nuisance theory in the same action in which inverse condemnation was alleged. Whether the plaintiff could recover in an inverse condemnation action for what is essentially a breach of contract was not an issue in the case. *Smart* did not even involve a contract.

As we explain below, the results in this case are the same under either breach of lease or inverse condemnation.

## II

Under any theory of liability, there is no justification for awarding damages based on the value of CIM's improvements in place.

## A

■ Compensatory damages for breach of contract are not measured by the gain to the breaching party. Instead, general damages are to compensate the aggrieved party for loss of the benefits he would have received by performance. (See 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 869, p. 956.)

The question is what did CIM lose because of County's breach? CIM argues that at the time the lease was made, the parties contemplated a different negotiating process for determining the value of the improvements at the lease's end. CIM contends that County was required to pay CIM a substantial amount for the improvements at the end of the lease to avoid the economic disruption that would ensue if the improvements were removed.

But the process CIM claims the parties contemplated was frustrated when the Coastal Commission enacted a regulation requiring any removal of the improvements to be accompanied by replacements. As the trial court found, the Coastal Commission regulation prevented removal. County could consider the effect of the regulation in its negotiations with CIM.

Moreover, although CIM may have contemplated that the threat of removal would force County to purchase the improvements at a substantial price, such a contemplation is not a legal right. Nothing in the lease required County to purchase CIM's improvements. If the parties failed to agree on a price, CIM's only recourse was to remove the improvements. In fact, that is what CIM attempted to do.

■ The trial court found that County breached the lease by refusing to cooperate and in actively opposing CIM's attempts to obtain the necessary permits for removal. Had CIM been able to exercise its right to remove the improvements, it would have obtained only salvage value. Thus any damages that may have been caused by County's breach would be limited to the salvage value of the improvements.

But the trial court found that even had County cooperated with CIM, the Coastal Commission would not have allowed the removal of the improvements. Thus the cause of CIM's loss was not County's breach of the lease,

but the Coastal Commission's regulations. CIM cites no authority for holding County liable for the effect of the Coastal Commission's regulations.

### B

■ The same result occurs under inverse condemnation. A property owner is entitled to recover just compensation measured by the fair market value of the property at the time of the taking. (*Klopping v. City of Whittier* (1972) 8 Cal.3d 39, 43 [104 Cal.Rptr. 1, 500 P.2d 1345].) Fair market value is determined by "the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no particular or urgent necessity for so doing, nor obliged to sell, and a buyer, being ready, willing, and able to buy but under no particular necessity for so doing, each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available." (Code Civ. Proc., § 1263.320, subd. (a).) County points out that the question "is not what the taker has gained, but what the owner has lost. [Citations.]" (*Tilem v. City of Los Angeles* (1983) 142 Cal.App.3d 694, 702 [191 Cal.Rptr. 229].)

CIM relies on *Almota Farmers Elevator & Whse. Co. v. U. S.* (1973) 409 U.S. 470 [35 L.Ed.2d 1, 93 S.Ct. 791]. There a grain elevator operator had seven years left on its lease when the federal government brought eminent domain proceedings. The government offered only salvage value for the leasehold improvements. The court held that the property owner was entitled to market value; that is, what a willing buyer would pay in cash to a willing seller. (*Id.* at p. 474.) The court concluded that the leasehold improvements should be valued in place over their useful life, taking into account the possibility the lease would be renewed as well as the possibility it might not. (*Ibid.*) The lessee should be in no better or worse position than if he had sold his leasehold to a private buyer. (*Id.* at p. 478.) But for the condemnation action, the lessee could have sold the leasehold along with the improvements to a willing buyer. The improvements would have in-place value over the remaining lease term plus any renewed term.

Here in contrast, a potential purchaser of CIM's interest would have to take into account that the lease had expired; that the only remaining right CIM had under the lease was to remove the improvements; and that removal of the improvements was barred by Coastal Commission regulations. In other words, CIM has nothing substantial to sell. That Vintage offered CIM substantial compensation for the sale of the lease prior to its expiration, says nothing about the value of CIM's interest after the lease expired.

CIM's reliance on *Lanning v. City of Monterey* (1986) 181 Cal.App.3d 352 [226 Cal.Rptr. 258] is misplaced. There a lessee constructed substantial

improvements on land leased from a private party. The lease could be terminated by either party upon six months' notice. The lease provided that in the event the premises were condemned, the lessee would receive any compensation due to the taking or destruction of the improvements. The lessor did not want to sell, but sold the land to the city under threat of condemnation. The sale was subject to the lease, and the lease was in effect when the city took title. Thereafter the city gave the lessee six months' notice to quit. The lessee brought an action in inverse condemnation against the city for the value of the improvements. The Court of Appeal held that the lessee was entitled to compensation for the improvements because the city's acquisition of the property was the equivalent of acquisition by eminent domain. (*Id.* at pp. 357–358.)

In *Lanning*, had the city acquired the property by eminent domain, the lessee, as provided in the terms of the lease, would have received compensation for the improvements. No different result should pertain where the city acts under threat of eminent domain.

Here, unlike *Lanning*, County did not acquire the underlying fee by threat of eminent domain and then terminate CIM's lease. County owned the underlying fee throughout the term of the lease, and the lease terminated on its own terms. Nor did County obtain the improvements by threat of eminent domain. As the trial court found, it was the Coastal Commission regulations that prevented CIM from removing the improvements.[4]

C

The dissent argues the fair market value of the improvements is $3.5 million. It is to County, but not to CIM. County owns the water and land on which the improvements float and sit. Had County acted in good faith and went to the ends of the earth to obtain permits for CIM, and had the Coastal Commission in fact allowed CIM to remove its improvements, CIM's damages would be salvage value, not the fair market value to the lessor. This rosy turn of events could not have occurred. The court's undisputed finding was that removal of the improvements was as a practical matter impossible. No matter what County did, the Coastal Commission would not have granted CIM permission to remove the improvements without replacing them. The California cases cited by the dissent are not applicable. Even if inverse

---

[4] Recently, our Supreme Court held that the requirement of presenting a timely written claim prior to filing suit against a public entity applies to contract actions. (Gov. Code, § 905; *City of Stockton v. Superior Court* (*Civic Partners*) (2007) 42 Cal.4th 730 [68 Cal.Rptr.3d 295, 171 P.3d 20].) Neither party raises the issue of compliance with the Government Claims Act. We need not discuss the issue.

condemnation principles applied in breach of contract cases, CIM would be entitled at best to salvage value damages. But here the lease expired before the alleged breach.

Whatever County's actions or motivations, it has to cause damage to be liable.

The judgment is reversed. Costs are awarded to appellant.

Yegan, J., concurred.

**COFFEE, J., Dissenting.**—I respectfully dissent.

The lynchpin of the majority's reversal of the jury's award of damages in this case is its mistaken position that Channel Islands Marina, Inc.'s (CIM) improvements had only salvage value at the end of the lease. On the contrary, as set forth frequently in the statement of decision of the trial judge, the land and waterside improvements had a "fair market value" to each party to the lease. Evidence of the existence of this value, among other things, can be found in the actions of the County of Ventura (County) in preventing CIM from removing the improvements.

The majority points to the trial court's finding that "the evidence established . . . that the Coastal Commission would not have issued a coastal development permit without a replacement plan, which CIM was clearly in no condition to satisfy." However, in the same paragraph, the court also found that, "[b]ased on the evidence, it appears that, if County had received a request from CIM for consent to its applications to state and federal permitting authorities, County would have refused."

The County actively prevented CIM from obtaining the necessary permits, some of which were under the County's direct control. It asserted in its complaint that CIM was required to obtain permits from the County and the City of Oxnard, and the approval of the harbor director. The County alleged that only after CIM had received these permits, could it obtain approval from the Coastal Commission to remove the improvements.

CIM was thwarted at every turn. In an attempt to comply with the initial permitting requirements, CIM obtained a demolition permit from the City of Oxnard. The City later rescinded the permit, informing CIM that it must first obtain permission from the County. The County filed its lawsuit to prevent CIM from proceeding with the permitting process for the removal of the improvements. The County disingenuously contended in its complaint that CIM had no legal right to remove the improvements because it lacked the

necessary permits. The County, by its actions, prevented CIM from proceeding with the steps necessary to bring it before the Coastal Commission.

The County acknowledges the fair market value of the improvements in its dealings with Vintage Marina Partners LP (Vintage). Vintage operates another marina in Channel Islands Harbor and has had a longtime interest in CIM's marina property. In March 2000, while CIM and the County were negotiating a lease renewal, Vintage offered $4.5 million to CIM to purchase its leasehold interest. CIM told the harbor master, Lyn Krieger, about the offer. She seemed surprised and indicated that negotiations had not gone as well as she had hoped. Krieger asked CIM if it could enter into immediate discussion about extending the lease. CIM agreed and put the offer from Vintage on hold while it pursued discussions with the County. In October 2002, Vintage offered CIM $2.5 million for the remaining term of the leasehold.

On November 1, 2002, after the negotiations between CIM and the County had begun to falter, Vintage wrote to Krieger indicating its interest in acquiring CIM's leasehold. During this time, Vintage held individual meetings concerning the CIM lease with members of the board of supervisors, the County's chief administrative officer and the County Harbor Department. In June 2003, Vintage submitted to Krieger a redevelopment proposal for the permitting, design and construction of waterside and landside improvements. The redevelopment was divided into four phases and was to span five years.

Vintage indicated in the proposal that, if it were awarded the lease, it "could potentially indemnify the County" for any liability in terminating the existing lease. Vintage's general manager later testified that Vintage was willing to indemnify the County for up to $3 million. The terms of the new lease were premised on the continued use and benefit of CIM's improvements.

The County reviewed the terms of the Vintage lease in a meeting on August 5, 2003, several weeks before expiration of the CIM lease. The Vintage lease was finalized in December.[1] Krieger testified that the County wanted the CIM waterside improvements to stay in place until permits could be obtained for new construction. Krieger hoped the permits could be obtained within 18 months, and she anticipated that construction could take three to four years. The buildings might be renovated, but Krieger testified there were no plans to demolish them.

---

[1] The general manager of Vintage testified that its lease with the County requires Vintage to meet certain criteria within a five-year period in order to obtain a 40-year lease. One of the requirements is that, by the end of the five years, Vintage must have obtained the permits and financing to begin construction of new waterside improvements.

The County's assertion on appeal that the improvements had only salvage value is belied by the substantial dollar value associated with their acquisition: Vintage's offers to CIM of $4.5 million and $2.5 million. This is arguably the most robust evidence of the fair market value of the improvements.

In the damages phase of the trial, the court and counsel labored extensively over the instructions defining fair market value, and the court ultimately selected the measure of damages as set forth in *Almota Farmers Elevator & Whse. Co. v. U. S.* (1973) 409 U.S. 470, 474–475 [35 L.Ed.2d 1, 93 S.Ct. 791]. The trial court instructed the jury to determine the fair market value of the improvements as of September 1, 2003, taking into account their useful life. The compensation was to be based on the "in place" value of the improvements without considering the time remaining on the CIM lease.[2] The County asked the jury to return a verdict of $800,000 to $850,000.

The majority's conclusion that the improvements had only salvage value is based solely on the County's April 2003 letter to CIM offering to purchase the improvements for $50,000. The majority's conclusion is contradicted by (1) the trial court's finding that the improvements had fair market value; (2) the jury instructions on fair market value; and (3) the jury's determination of the amount of that fair market value, based on the evidence offered by both CIM and the County.

If the improvements had only salvage value, why insist they remain? Why would the County independently bargain with a third party to operate the marina using those improvements? Why would that third party agree to a seven-figure indemnity payment to cover an adverse verdict in the County's lawsuit against CIM? Given Vintage's substantial offers to CIM of $4.5 million and $2.5 million, is it merely coincidental that the jury determined fair market value to be $3.5 million?

The majority states that federal case law persuades it that CIM's remedy is in contract, thus it has no cause of action in inverse condemnation. It relies on three federal cases, cited below, two of which were issued by the Federal Court of Claims. However, federal case law is not precedent and we are not

---

[2] The jury was instructed, "Do not consider any personal value of the leasehold improvements to Channel Islands Marina, Inc. or its need for the leasehold improvements. Also, do not consider the particular need of the County of Ventura for the leasehold improvements. [¶] The compensation for the leasehold improvements in this case is to be based on their 'in place' value, without any limitation to the time remaining on the former lease between Channel Islands Marina, Inc. and the County or any other lease. [¶] In determining the fair market value of the leasehold improvements on September 1, 2003, you are to consider the useful life of the leasehold improvements. [¶] In determining the fair market value of the leasehold improvements taken, you should not include any increase or decrease in the value of the leasehold improvements that is attributable to the project for which the property was taken."

bound by the decisions of the lower federal courts. (*Tully v. World Savings & Loan Assn.* (1997) 56 Cal.App.4th 654, 663 [65 Cal.Rptr.2d 545].)

The cited cases concern takings claims that are premised on the loss of royalties, employment income and investments. (*Marathon Oil Co. v. U.S.* (1989) 16 Cl. Ct. 332 [plaintiff's claim that excessive royalty payments on an oil lease constituted a taking]; *Scan-Tech Security, L.P. v. U.S.* (2000) 46 Fed.Cl. 326 [contractor's allegation that government's failure to pay him for creating a prototype was a taking]; *Castle v. U.S.* (2002) 301 F.3d 1328 [regulatory taking allegedly occurred when shareholders of troubled savings and loan lost their investments due to the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act].) These authorities do not explain how the CIM lease agreement provides redress for the County's interference with CIM's property rights. Moreover, the cases are factually disparate. None concern a financial loss stemming from the government's act of forcibly obtaining title to private property and its unauthorized use of that property to operate a business.

Under United States Supreme Court precedent, California case authority and the California statutory scheme, a tenant is entitled to just compensation for leasehold improvements taken by eminent domain. (*Almota Farmers Elevator & Whse. Co. v. U. S., supra,* 409 U.S. 470, 474–475; *Lanning v. City of Monterey* (1986) 181 Cal.App.3d 352, 356 [226 Cal.Rptr. 258]; *Concrete Service Co. v. State of California ex rel. Dept. Pub. Wks.* (1969) 274 Cal.App.2d 142, 147 [78 Cal.Rptr. 923] (*Concrete I*); *Concrete Service Co. v. State of California ex rel. Dept. Pub. Wks.* (1972) 29 Cal.App.3d 664, 666 [105 Cal.Rptr. 721]; Code Civ. Proc., § 1263.210.)

Just compensation is measured by the fair market value of the property at the time of the taking. (*Almota Farmers Elevator & Whse. Co. v. U. S., supra,* 409 U.S. at p. 474.) In the context of tenant-owned leasehold improvements, fair market value is defined as "the continued ability of the buyer to use the improvements over their useful life." (*Id.* at p. 475.) This applies whether the lessee "sold the improvements to the fee owner or to a new lessee at the end of the lease term . . . ." (*Id.* at p. 474.)

A public entity's actions may constitute a taking, even when it acquires the property under *threat* of condemnation. (*Johnston v. Sonoma County Agricultural Preservation & Open Space Dist.* (2002) 100 Cal.App.4th 973, 987 [123 Cal.Rptr.2d 226]; *Lanning v. City of Monterey, supra,* 181 Cal.App.3d at p. 356; see also *Concrete I, supra,* 274 Cal.App.2d at p. 147.)

This triggers the law of inverse condemnation. (*Johnston*, at pp. 987–988, fn. 8.) In the case at bar, the County did more than threaten condemnation. It forcibly took title to CIM's improvements and began using them without paying just compensation. Inverse condemnation is an appropriate remedy and CIM is entitled to compensation, measured by the fair market value of the improvements.

I would affirm the judgment.

Respondent's petition for review by the Supreme Court was denied May 21, 2008, S161617. Kennard, J., Baxter, J., and Werdegar, J., were of the opinion that the petition should be granted.