Filed 10/17/14  Scheinberg v. County of Sonoma CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| PAUL SCHEINBERG, as Trustee, etc.,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>COUNTY OF SONOMA,<br><br>     Defendant and Respondent. | A135286<br><br>(Sonoma County<br>Super. Ct. No. SCV-242816) |

In 1987, Dr. Everett and Mrs. Marceline Salmon bought an abandoned railroad right-of-way, located between two other parcels of land they owned in Sebastopol, and donated it to Sonoma County for use as part of a public trail.  In exchange, the County promised to convey an easement over the railroad property to the Salmons to permit access between their two parcels, but the conveyance was never finalized.  Twenty years later, after the Salmons had died, Paul Scheinberg, trustee of the Salmon Family Trust (Trust), entered a contract to sell the two parcels to Santa Rosa Junior College (SRJC), which wanted to build a satellite campus there.  Among other conditions, the contract required the Trust to obtain an easement over the railroad property from the County.  After it became apparent that the easement would not be readily conveyed, SRJC terminated the contract.

On behalf of the Trust, Scheinberg then brought this suit against the County.  A jury rejected his claims of breach of covenant, breach of contract, and intentional interference with contract, and the trial court rejected his claims of inverse condemnation,

1

quiet title, mandatory injunctive relief, and specific performance. The court granted an easement on his claim for declaratory relief.

On appeal, Scheinberg contends that the judgment below must be reversed because (1) the trial court wrongly granted a directed verdict on the inverse-condemnation claim; (2) the jury's verdict on the breach-of-contract claim is internally inconsistent and was based on instructional errors; (3) the jury's verdict on the claim of intentional interference with contract was based on an instructional error; and (4) the jury's verdicts cannot stand because of juror misconduct. In its cross-appeal, the County contends that the court improperly granted the easement to Scheinberg.[1] We reject both parties' claims and affirm.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

The Salmons owned about 20 acres of land near Highway 116 in Sebastopol. A strip of land originally used for a railroad track divided a small triangular parcel of their land, which abutted Highway 116, from the rest of their land, which did not. The Salmons offered to buy the railroad right-of-way and donate it to the County for use in developing a public trail. In December 1987, the Salmons and the County entered into a dedication agreement. It provided that the Salmons would donate the railroad property to the County and that, in exchange, "the County shall convey to [the Salmons] an easement over and across the [r]ailroad [p]roperty for the purpose of allowing [the Salmons] access between real property owned by them which lies on either side of the [r]ailroad [p]roperty. The easement shall be 70 feet wide." The day after the dedication agreement was entered, escrow closed on the railroad property, and the Salmons executed a grant deed conveying the land to the County. The deed provided that it was "subject to all of

---

[1] Scheinberg filed a motion to strike the County's cross-appellant's reply brief on the grounds that the County had used it to counter issues raised in Scheinberg's opening brief that could have been countered in the County's respondent's brief. We grant Scheinberg's motion in part and disregard sections I.A. and I.B. of the County's reply brief. (See Cal. Rules of Court, rule 8.216(b)(3).)

2

the terms, conditions, restrictions[,] and provisions set forth in" the dedication agreement. (Capitalization omitted.)

The Salmons' donation was "an important kicking-off point" for development of the 13-mile-long Joe Rodota/West County Trail (the trail), which was dedicated in 1995. The trail was "the first regional trail in the county that connected three or four communities" and is "fairly heavily used." Approximately 200,000 people use it each year, including hikers, commuters, equestrians, and cyclists. The trail has "signals or stop signs" where it crosses streets, but travel on it is otherwise unrestricted.

In the early 1990's, the County approached Mrs. Salmon to discuss several issues related to the trail, including the easement. The County questioned whether, in light of the Salmons' plan to use the easement for residential access, the easement really needed to be 70 feet wide, which was nearly as wide as Highway 116 itself. Mrs. Salmon agreed that the easement's width could be reduced to 50 feet. She also offered to grant the triangular parcel to the County for use as a trailhead. In 1992 and 1994, the County sent the Salmons amendments to the dedication agreement to reflect these discussions and fix the easement's location, but the amendments were never executed. The County followed up again in 1996 after Mrs. Salmon fell ill, but she died in 1998 without having conveyed the easement.

Over the next several years, the County and Dr. Salmon communicated as part of negotiations between him and a neighboring business park about creating a joint access point to Highway 116 over the triangular parcel. In 2001, Dr. Salmon offered to dedicate the triangular parcel to the County, but only if the business park built a parking lot there. The business park never developed the parcel, however, and the easement was not processed.

Dr. Salmon died in 2006, and Scheinberg, the family's longtime accountant, became trustee of the Trust. Scheinberg approached SRJC, which he knew was interested in purchasing the family's property for use as a satellite campus. In mid-2006, SRJC sent Scheinberg a letter of intent to purchase the Trust's property for $3.25 million.

3

Scheinberg countered at $5 million, and he and SRJC executed a revised letter of intent with that price.

In early 2007, SRJC told Scheinberg that it had learned from a title search that an easement across the railroad property had never been recorded. Scheinberg understood that the easement was "important" to SRJC because it would provide access from Highway 116 to the proposed campus. He contacted a County employee who agreed to work on finalizing an easement and said the process could take several months. Scheinberg told the County that the easement needed to be 70 feet wide.

In May 2007, SRJC and Scheinberg executed a $5 million purchase-and-sale agreement. The contract contained several conditions to SRJC's performance, one of which required Scheinberg to obtain, "[a]s soon as reasonably possible and not later than two hundred forty (240) days after the execution of [the a]greement . . . a grant deed for an easement for a right-of-way seventy (70) feet in width over and across" the railroad property. Two hundred forty days from the execution of the agreement was January 4, 2008. The agreement provided that escrow would close over two years later, in July 2009. It also required SRJC to deposit $300,000 with the escrow company, to be released to Scheinberg in $60,000 increments at specified times leading up to the close of escrow, including on a date a few days after the January 4, 2008 deadline.

Scheinberg did not initially tell the County that he planned to sell the Trust's property to SRJC, but the County soon learned of the SRJC contract and SRJC's plans to develop the property into a campus. Although SRJC anticipated that it would take several years before the campus was built, it planned to serve 250 to 300 students each semester at that campus and provide access from Highway 116 over the trail. The County was concerned about the campus's potential effect on the trail and the safety of its users. The County also worried that SRJC, as a community college, would be able to exempt itself from zoning and local regulations that would otherwise give the County a measure of control over the easement's development.

In August 2007, Scheinberg and the County met to discuss the easement's terms. The County expressed its concerns about the large amount of possible vehicular traffic

4

over the trail, and Scheinberg countered that he was entitled to an easement without restrictions beyond those in the dedication agreement. Scheinberg later provided a draft description of the easement that stated it was "for road access, construction and maintenance, public & private underground utilities and drainage purposes." The draft excluded terms related to the County's concerns.

In early October, the County sent Scheinberg a draft agreement to fix the easement and amend the dedication agreement. The County proposed a "non-exclusive seventy (70) foot wide roadway and underground utility and drainage easement . . . for the purpose of constructing, repairing, and maintaining a road, underground utilities[,] and drainage." The draft agreement included a limitation to use "for ingress and egress . . . [for] up to eight (8) rural residential lots," a requirement that the County approve the construction of any improvements, and a supplemental dedication of the triangular parcel for use as a trailhead.

Scheinberg objected to these terms, and his attorney drafted a letter to the County Counsel, Steven Woodside, demanding an easement "in accordance with" that described in the dedication agreement and "without [any additional] material conditions, restrictions[,] or limitations." The letter stated that the Trust had until January to obtain the easement and threatened litigation if the County did not "perform its obligations under the [d]edication [a]greement." In early November, Scheinberg's attorney met with Woodside and showed him the letter. A few weeks later, the County sent another proposal to Scheinberg's attorney that no longer limited the easement to residential use but added a term requiring the Trust to mitigate traffic impacts on the trail and giving the County the right to review and approve mitigation plans.

On December 6, SRJC's attorney sent Scheinberg a letter notifying him of SRJC's intent to terminate the contract if the easement was not obtained by the January deadline. The same day, Scheinberg and his attorney met with Woodside and other County employees for further discussions. Woodside asked if the County could meet with SRJC directly, and Scheinberg's attorney refused. A few days later, the County Board of

5

Supervisors held a meeting to discuss the issue and instructed Woodside to continue negotiating "and [to] try to reach agreement on some of [the] safety concerns."

On December 19, SRJC's attorney sent an e-mail to Scheinberg's attorney reiterating SRJC's intent to terminate the contract and stating that it was "very unfortunate that the County has taken this position to kill the deal." The day after Scheinberg's attorney forwarded that e-mail to Woodside, the County sent another proposal to Scheinberg. The document was styled as a list of points for settlement of the dispute and offered to grant an easement to SRJC in exchange for SRJC's paying for various safety measures and agreeing that the County could review and approve mitigation measures. Five days later, on December 26, Scheinberg's attorney forwarded the proposal to SRJC's attorney and asked whether it was agreeable. A week passed before SRJC's attorney responded that "[t]he County's proposal contains too many unacceptable conditions to the granting of the easement" and "would also give the County future means to extract further concessions or withhold approvals for the [c]ollege's development." Scheinberg asked for additional time to obtain the easement, but SRJC refused. On January 7, 2008, SRJC terminated the contract.

Scheinberg sued the County, alleging causes of action for (1) breach of covenant (grant deed); (2) breach of contract (dedication agreement); (3) intentional interference with contract (SRJC contract); (4) quiet title; (5) inverse condemnation; (6) declaratory relief; (7) injunctive relief; and (8) specific performance (dedication agreement).

A month-long trial took place in late 2011. The County successfully moved for a directed verdict on the inverse-condemnation claim. The claims of breach of contract and intentional interference with contract were submitted to the jury, which returned special verdicts finding the County not liable for either claim by a nine to three vote.[2] The trial court resolved the claims for quiet title, injunctive relief, and specific performance in the

---

[2] The trial court concluded that separate jury instructions on the breach-of-covenant claim were unnecessary because a breach of the dedication agreement would necessarily constitute a breach of the grant deed. On appeal, Scheinberg does not challenge that ruling.

6

County's favor as well. On the claim for declaratory relief, however, the court granted a 70-foot-wide easement to Scheinberg. The easement permits construction of a road and is not limited to residential use, but it is subject to various terms protecting the safety and enjoyment of the trail's users and giving the County the right to review and comment on (but not approve) construction plans.

After the verdicts, Scheinberg's counsel discovered that one of the jurors had posted a blog entry about the case during the trial. Scheinberg moved for a new trial on the ground of juror misconduct. The trial court found that the posting of the entry constituted misconduct but denied the motion, concluding that prejudice had not been shown.

## II.
### DISCUSSION

A.    *The Trial Court Properly Granted a Directed Verdict on the Inverse-Condemnation Claim.*

Scheinberg claims that the trial court erred as a matter of law in granting a directed verdict in favor of the County on the inverse-condemnation claim. He argues that we must reverse the judgment and direct the court to enter judgment in his favor on this claim because "the undisputed facts support a finding of liability . . . as a matter of law." We disagree.

The cause of action for inverse condemnation alleged that the County had committed a taking "by its refusal to grant the 70-foot wide access easement as required by the [d]edication [a]greement and as reflected by the express grant of the easement in that document or the express reservation of the same as reflected in the Salmons' express reservation, or as required by the deed covenant/restriction." At the close of evidence, the County moved for a directed verdict under Code of Civil Procedure section 630,[3] arguing that there was no taking under *County of Ventura v. Channel Islands Marina,*

---

[3] All further statutory references are to the Code of Civil Procedure unless otherwise noted.

*Inc.* (2008) 159 Cal.App.4th 615 (*Ventura*) "because the property right at issue was created and governed by contract."

The trial court orally granted the motion. It stated, "I do think that [*Ventura*, *supra*, 159 Cal.App.4th 615] is dispositive. . . . [¶] Here we have an . . . alleged . . . breach of contract, but I don't think the [C]ounty's conduct rises above that. I don't believe there's any regulatory taking here under the case law. First of all, I don't think it was a matter of regulation but simply a possible breach of an agreement to convey an easement, and it certainly didn't deprive the property owner of all value of the property. [¶] In addition to that, [Scheinberg] was seeking conveyance of the easement through quiet title in this action, and it's my belief that by the end of this trial [he] will have an easement. . . . So there hasn't been any taking in that sense." In its subsequent statement of decision, the court summarized its ruling as follows: "The evidence adduced by S[c]heinberg did not establish facts sufficient to support a takings claim. Allegations of breach of contract do not rise to the level of a taking. [*Ventura*.]"

The grant of a directed verdict is reviewed de novo. (*Baker v. American Horticulture Supply, Inc.* (2010) 186 Cal.App.4th 1059, 1072.) " ' "In reviewing a grant of . . . [a] directed verdict . . ., we . . . will not sustain the judgment ' "unless interpreting the evidence most favorably to [the] plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences[,] and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law." ' " [Citation.]' " (*Ibid.*) "If there is substantial evidence to support the appellant's claim, and if the state of the law also supports that claim, we must reverse the judgment." (*Conn v. Western Placer Unified School Dist.* (2010) 186 Cal.App.4th 1163, 1174.)

The County argues that because it moved for a directed verdict after both sides had rested, we should view the evidence in the light most favorable to the judgment instead of in the light most favorable to Scheinberg. The authorities it cites, however, do not support this distinction. (*Dina v. People ex rel. Dept. of Transportation* (2007) 151 Cal.App.4th 1029, 1045 [contrasting standard of review applicable to judgment entered after successful motion under § 1260.040 with that applicable to judgment after

8

trial]; *Buckley v. California Coastal Com.* (1998) 68 Cal.App.4th 178, 192 [reviewing judgment after trial for substantial evidence].) We conclude that we must review the evidence in the light most favorable to Scheinberg. (See, e.g., *Conn v. Western Placer Unified School Dist.*, *supra*, 186 Cal.App.4th at pp. 1174-1175 [reviewing evidence supporting judgment entered on directed verdict moved for after close of evidence in light most favorable to appellant]; *Brassinga v. City of Mountain View* (1998) 66 Cal.App.4th 195, 207, 210 [same].) In doing so, we nonetheless conclude that the trial court properly granted a directed verdict on the inverse-condemnation claim because the County was entitled to judgment as a matter of law.

Under both the federal and California Constitutions, private property cannot be "taken" for public use without the payment of " 'just compensation.' " (U.S. Const., 5th amend.; Cal. Const., art. I, § 19, subd. (a); see also *First English Evangelical Lutheran Church v. County of Los Angeles* (1987) 482 U.S. 304, 310, fn. 4.) A property owner may bring a cause of action for inverse condemnation to recover damages resulting from any such unlawful taking. (*First English*, at p. 315; *Baker v. Burbank-Glendale-Pasadena Airport Authority* (1985) 39 Cal.3d 862, 867 & fn. 4.) The federal and state constitutional clauses are construed "congruently," except for a difference in scope that is immaterial here. (*San Remo Hotel v. City and County of San Francisco* (2002) 27 Cal.4th 643, 664.)

Under *Ventura*, *supra*, 159 Cal.App.4th 615, "[t]aking claims do not arise from a breach of contract." (*Id.* at p. 618.) In that case, the plaintiff constructed and operated a marina on land it had leased from Ventura County. (*Ibid.*) The lease provided that the county could negotiate to purchase the improvements when the lease expired. (*Id.* at p. 619.) It also provided that title to the improvements would vest in the county if no such agreement could be reached and the improvements were not removed. (*Ibid.*) The lease expired, and the county took possession of the improvements after the parties were unable to reach an agreement for their purchase and the plaintiff was unable to remove them. (*Id.* at pp. 621-622.)

9

The Court of Appeal held that the plaintiff had no claim for inverse condemnation. (*Ventura*, *supra*, 159 Cal.App.4th at pp. 624-626.) "The rights and duties of the parties spr[a]ng from the lease," as did "liabilities arising from [its] breach," and the court saw "no reason to impose extracontractual liability for breach, simply because the breaching party [was] a governmental entity." (*Id.* at p. 625.) The court concluded that "[t]o say a breach of contract or lease implicates the Fifth Amendment to the United States Constitution or article I, section 19 of the California Constitution . . . stretches the meaning of those provisions well beyond reason." (*Ibid.*)

Attempting to distinguish *Ventura*, *supra*, 159 Cal.App.4th 615, Scheinberg claims that the Salmons retained the easement when they conveyed the railroad property to the County. But this is incorrect even viewing the evidence in the light most favorable to Scheinberg. The plain language of the dedication agreement required the County to "convey" an easement to the Salmons in exchange for their donation of the railroad property. If the Salmons had retained the easement for themselves, there would have been no need for the agreement to require that the County give it back. Once the Salmons deeded the railroad property to the County, they had no right to an easement independent of the dedication agreement. Scheinberg's takings claim is thus barred under *Ventura* because the claimed taking is a breach of an agreement to convey an interest that did not "exist independently of the contract at issue." (*Ventura*, at p. 624.)

Scheinberg also attempts to distinguish *Ventura*, *supra*, 159 Cal.App.4th 615 on the basis that it involved "an otherwise private commercial dispute" instead of the taking of property for "public use." But such a distinction played no role in the *Ventura* court's reasoning, which was based on the source of the property right. (See *id.* at p. 625.) And, in any event, *Ventura did* involve the public's use of the improvements. (*Id.* at p. 621 [noting that the county opposed the improvements' demolition on several grounds, including endangerment of "public coastal access and recreational boating"].)

Scheinberg urges us to reject *Ventura*, *supra*, 159 Cal.App.4th 615 for the additional reason that it has been undermined by "subsequent federal authority." We are not persuaded. He first cites *Stockton East Water Dist. v. United States* (Fed.Cir. 2009)

10

583 F.3d 1344, which involved the federal government's alleged breach of contractual promises to provide quantities of water to water agencies. (*Id.* at pp. 1348-1349.) The trial court had dismissed the takings claim solely "on the ground that the [accompanying breach of] contract claim precluded the takings claim." (*Id.* at p. 1369.) The Federal Circuit rejected the conclusion that a party cannot bring a takings claim and a breach-of-contract claim in the same suit, holding that a party may allege "two alternative theories for recovery against the Government." (*Id.* at p. 1368.) But in so holding, the court expressed no opinion on the merits of the takings claim. And it certainly did not hold that the alleged breach of contract itself constituted a taking, which is essentially what Scheinberg is asking us to hold here.

Scheinberg also cites *Henry Housing Ltd. Partnership v. United States* (Ct.Cl. 2010) 95 Fed.Cl. 250, a case involving a plaintiff that obtained a government-backed mortgage requiring it to provide low-income housing at the apartments it owned until the mortgage was repaid. (*Id.* at p. 252.) The government subsequently enacted legislation imposing restrictions on the early repayment of such mortgages. (*Id.* at pp. 253-254.) After it was denied permission to repay its loan, the plaintiff sued, arguing that the denial amounted to a breach of contract and a taking because, in contravention of the original mortgage, it could not repay the mortgage and free itself from the obligation to provide low-income housing. (*Ibid.*) As did *Stockton East Water Dist. v. United States*, *supra*, 583 F.3d 1344, *Henry Housing* merely held that a party may allege breach-of-contract and takings claims against the government in the same proceeding. (*Henry Housing*, at p. 255; see also *Century Exploration New Orleans, Inc. v. United States* (Ct.Cl. 2012) 103 Fed.Cl. 70, 77 [explaining *Stockton East*].) Furthermore, the interest allegedly "taken" in *Henry Housing* was the diminishment in value of property the plaintiff owned independently of the mortgage agreement. In contrast, the only "property" here is an interest that arises solely from the contract at issue.

Scheinberg also claims that *Ventura*, *supra*, 159 Cal.App.4th 615 is "in tension with" cases recognizing that rights arising from a contract may be the subject of takings claims or eminent-domain actions. But the decisions he cites do not support his

11

argument. Although rights gained through a government contract may be protected against uncompensated takings, the relevant portion of the dedication agreement here did not convey the easement to the Salmons but was merely the County's promise to do so in the future. As a result, decisions involving rights actually conveyed by contract are distinguishable. (See *Lynch v. United States* (1934) 292 U.S. 571, 574-576, 579 [Fifth Amendment protected beneficiary's rights stemming from government-issued insurance policy]; *City of Oakland v. Oakland Raiders* (1982) 32 Cal.3d 60, 63-64, 76 [football franchise characterized as " 'network of intangible contractual rights' " potentially subject to city's power of eminent domain].)

Finally, Scheinberg argues that his claim is independently viable under *Nollan v. California Coastal Com.* (1987) 483 U.S. 825 because "the County conditioned performance of a pre-existing obligation on the donation of additional property." (Italics omitted.) In *Nollan*, the United States Supreme Court held that it amounted to an unconstitutional taking for a state agency to require a property owner to give the agency an easement before it would issue a land-use permit allowing the owner to build a beachfront house. (*Id.* at pp. 827, 831, 834, 841-842.) *Nollan* and the other decisions Scheinberg cites are inapposite because the property Scheinberg claims was "taken" was the easement, but the easement is not what Scheinberg alleges the County was demanding be donated. (*Koontz v. St. Johns River Water Mgmt. Dist.* (2013) 133 S.Ct. 2586, 2591, 2593, 2595, 2599 [agency denied land-use permit because owner would not convey easement or pay for mitigation measures in exchange]; *Uniwill v. City of Los Angeles* (2004) 124 Cal.App.4th 537, 539-540 [city refused to certify compliance with building permit unless builder conveyed easement].) And as we have already explained, the easement is not subject to a takings claim because the Salmons never possessed it and only had a right to it by virtue of the dedication agreement. We conclude that the trial court properly granted a directed verdict on Scheinberg's claim for inverse condemnation.

12

*B.* *Scheinberg's Challenges to the Jury's Breach-of-Contract Verdict Are Without Merit.*

Scheinberg argues that the judgment on the breach-of-contract claim must be reversed because the jury's special verdict was irreconcilably inconsistent, the jury should not have been allowed to interpret the dedication agreement, and the trial court erred by giving an instruction regarding "tender." We reject these arguments.

1. Scheinberg waived his inconsistent-verdict claim.

Scheinberg first argues that the jury's responses to the questions on the special-verdict form for the breach-of-contract claim are inconsistent. We conclude he waived this argument.

The first question on the special-verdict form asked, "Did the Salmons and the . . . Trust do all, or substantially all, of the significant things that the [d]edication [a]greement required them to do?"[4] The second question asked, "Had all of the conditions that were required for [the] County['s] . . . performance of the [d]edication [a]greement occur[r]ed?" During deliberations, the jury sent a note to the trial court asking for "clarif[ication of] the intent" of the second question. After receiving input from the parties' counsel, both of whom agreed to the proposed response, the court responded, "This question refers to [an element] in Instruction 303 [i.e., the *first* question on the verdict form]. . . . As stated in that element, you must determine whether the Salmons and [Scheinberg] performed all of their significant obligations under the [d]edication [a]greement." The jury returned a verdict answering "yes" to the first question and "no" to the second question. Scheinberg did not object below that the answers were inconsistent.

A jury is not permitted to " 'make inconsistent determinations of fact based on the same evidence.' " (*City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 682.) "An inconsistent verdict may arise from an inconsistency

---

[4] The special-verdict form did not include a question on the undisputed first element of the breach-of-contract claim: that the Salmons and the County entered the dedication agreement.

13

between or among answers within a special verdict [citation] or irreconcilable findings." (*Ibid.*) " 'Inconsistent verdicts are " 'against the law' " ' and are grounds for a new trial." (*Ibid.*; see also § 657, subd. (6).)

We review de novo whether a special verdict is inconsistent. (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 358.) Unlike a general verdict, a special verdict is not presumed to be correct. (*Mendoza v. Club Car, Inc.* (2000) 81 Cal.App.4th 287, 303.) As a result, "[w]hen a special verdict is involved . . ., a reviewing court does not imply findings in favor of the prevailing party." (*City of San Diego v. D.R. Horton San Diego Holding Co., Inc.*, *supra*, 126 Cal.App.4th at p. 678.) " 'The appellate court is not permitted to choose between inconsistent answers' " in a special verdict, but if the "verdict is not 'hopelessly ambiguous,' the court may ' "interpret [it] from its language considered in connection with the pleadings, evidence[,] and [jury] instructions." ' " (*Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1092.)

The jury's responses to the first two special-verdict questions are not inconsistent on their face, and Scheinberg does not contend otherwise. Instead, he argues that the responses are inconsistent in light of the trial court's response to the jury's request for clarification, which essentially instructed that the second question meant the same thing as the first one. We agree with Scheinberg that the court's answer conflated the two elements. But even if the answer confused the jury and rendered its verdict inconsistent, Scheinberg waived any challenge by failing to object to the answer when it was given. His trial counsel participated in formulating the answer, approved the final answer that was given, and never suggested that the wrong element was being described. Under these circumstances, Scheinberg cannot now complain that the court's answer created an inconsistent verdict. (See *People v. Jennings* (2010) 50 Cal.4th 616, 683 [claim that trial court erroneously responded to jury's question waived "because defense counsel both participated in the formulation of a response and affirmatively approved of the response ultimately given"].)

Scheinberg also argues that, even apart from the trial court's answer to the jury's question, the jury's responses to the two special-verdict questions are inconsistent. He

14

claims that because "[t]here were no conditions—[i.e.], no extrinsic event—needed to trigger the County's duty other than the Salmons and/or [he] doing what was required of them," the jury had to answer "yes" to the second question once it answered "yes" to the first question. But Scheinberg agreed to the special-verdict form, and the record does not indicate that he ever requested a modification of it (or the jury instructions it reflected) to eliminate the alleged redundancy of the two questions. We conclude he therefore waived his claim that the special verdict was inconsistent on this basis as well. (See, e.g., *Mesecher v. County of San Diego* (1992) 9 Cal.App.4th 1677, 1680, 1686-1687 [claim that verdict inconsistent waived where parties jointly prepared special-verdict form inviting conflicting answers]; *Electronic Equipment Express, Inc. v. Donald H. Seiler & Co.* (1981) 122 Cal.App.3d 834, 858 ["where the record is devoid of any showing that [an] appellant[] objected to the special verdict questions, any inherent error therein is waived"].)

Scheinberg argues that an inconsistent-verdict claim may only be waived where "the failure to object was 'the result of a desire to reap a ["]technical advantage["] or engage in a "litigious strategy.["]' " (Quoting *Woodcock v. Fontana Scaffolding & Equipment Co.* (1968) 69 Cal.2d 452, 456, fn. 2.) The two authorities he cites do not support his position. *Woodcock* addressed when there may be a waiver arising from the "failure to object to the form of a verdict before the jury is discharged." (*Ibid.*) But here the waiver is based not on Scheinberg's failure to " 'request a more formal and certain verdict' " from the jury before it was discharged but instead on Scheinberg's acquiescence to both the verdict form and the trial court's answer to the jury's request for clarification. (*Id.* at p. 456.) And *Zagami, Inc. v. James A. Crone, Inc.*, *supra*, 160 Cal.App.4th 1083 makes the same distinction between failure to object to the verdict itself, which will generally not result in a waiver, and failure to object to the verdict form, which generally will. (*Id.* at p. 1092, fn. 5, 1093, fn. 6 ["if the form of a verdict is defective, the complaining party must object or risk waiver on appeal of any such defect," italics omitted].) We therefore reject Scheinberg's claim that the special verdict was inconsistent.

        2.      Scheinberg fails to identify how the submission of an interpretive dispute to the jury could have affected its verdict.

Scheinberg next argues that the breach-of-contract verdict must be overturned because the trial court erred by submitting an issue of interpretation of the dedication agreement to the jury.[5] We disagree.

The jury was instructed under a modified version of CACI No. 314 as follows: "The parties dispute the meaning of the following term: [']County shall convey to [the Salmons] an easement over and across the [r]ailroad [p]roperty for the purpose of allowing [them] access between real property owned by them which lies on either side of the [r]ailroad [p]roperty. The easement shall be 70 feet wide.['] [¶] [Scheinberg] claims that the language means the County was obligated to grant, upon demand, an easement without any restriction[,] unless contained in the [d]edication [a]greement, to allow access across the trail at a location to be determined. [Scheinberg] must prove that his interpretation is correct. [¶] [The County] claims that the language means that in the future it would grant an easement subject to reasonable terms and conditions. [¶] In deciding what the terms of an agreement mean, you must decide what the parties intended at the time the [d]edication [a]greement was created. You may consider the usual and ordinary meaning of the language used in the [a]greement as well as the circumstances surrounding the making of the agreement."

Scheinberg objected to this instruction on several bases, including that there was "no actual extrinsic evidence being offered as to the intent of the parties at the time of contracting, and the potential conduct of the parties after[ward] applies to modifications of the dedication agreement, not to the original dedication agreement and the parties' understanding [of it, so] there is no question of extrinsic evidence to interpret to go to the jury." The trial court ruled that the instruction "fairly set[] out what the two parties' sides

_____

[5] Scheinberg also argues that the trial court erred by refusing to give his requested "instructions reflecting the proper interpretation of the agreement," including an instruction that the Salmons had a floating easement. He does not, however, provide any reason this purported failure was erroneous apart from the claim that the interpretive dispute should not have been submitted to the jury.

16

are" regarding their "different positions on how the obligation in the contract is to be interpreted."

The first step in interpreting a contract term is to determine whether it "is ambiguous—that is, reasonably susceptible to more than one interpretation." (*Scheenstra v. California Dairies, Inc.* (2013) 213 Cal.App.4th 370, 389.)  If "there is no ambiguity[,] . . . then the judicial inquiry into meaning is finished and the clear and explicit meaning governs" and will be applied by the trial court.  (*Id.* at p. 390.)  "[A] contract apparently unambiguous on its face," however, "may still contain a latent ambiguity that can only be exposed by extrinsic evidence."  (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1133.)  If a term is "ambiguous or uncertain," its meaning generally "is a question of fact for the trier of fact . . ., based on 'all credible evidence concerning the parties' intentions.' " (*Cotran v. Rollins Hudig Hall Internat., Inc.* (1998) 17 Cal.4th 93, 112.)  If, however, extrinsic evidence reveals an ambiguity in the contract but the evidence itself does not conflict, "the interpretation of the contract remains a matter of law."  (*Wolf*, at p. 1134.)

We review de novo the issues whether a contract is ambiguous and whether conflicting extrinsic evidence has been presented.  (*Scheenstra v. California Dairies, Inc.*, *supra*, 213 Cal.App.4th at pp. 389-390.)  "If no extrinsic evidence was presented or if the extrinsic evidence was not in conflict, the resolution of the ambiguity is a question of law, which is subject to independent review on appeal.  [Citation.]  Even where uncontroverted evidence allows for conflicting inferences to be drawn, . . . the interpretation of the written contract [is] solely a judicial function."  (*Id.* at p. 390.)  But if the extrinsic evidence conflicts and findings of fact must be made to resolve the ambiguity, "appellate courts will uphold any reasonable construction [of the contract] . . . 'as long as it is supported by substantial evidence.  [Citation.]' " (*Id.* at p. 390, fn. 14.)

Scheinberg argues that the trial court erred by instructing the jury under CACI No. 314 because the contract term was unambiguous and there was no conflicting extrinsic evidence about its meaning.  There was no question on the verdict form asking the jury to decide between the competing interpretations, and the jury thus did not

17

directly pass on this issue. (Cf. *Wolf v. Walt Disney Pictures & Television*, *supra*, 162 Cal.App.4th at pp. 1116, 1133-1137 [reversing where trial court improperly submitted interpretation issue to jury and jury's answer was incorrect as matter of law].) Scheinberg does not explain how the verdict nevertheless establishes that the jury accepted the County's interpretation of the dedication agreement instead of his. The scope of the easement the County was required to convey bears on the issue of the County's obligations under the agreement. That issue is most directly addressed by the third question on the special-verdict form, which the jury never reached.

It could be argued that the interpretation issue bore on the verdict form's second question based on the trial court's explanation of the jury's verdict. The court concluded that the jury's finding that not all the conditions for the County's performance had occurred reflected the jury's determination that Scheinberg did not make a reasonable demand. Where, as here, a contract fails to specify a time for performance, "a demand is 'usually necessary' in order to give the promissor an opportunity to perform and may be [an implied] condition precedent to the obligation to perform." (*Drake v. Martin* (1994) 30 Cal.App.4th 984, 998-999.) The scope of the easement promised in the dedication agreement could bear on whether a reasonable demand was made, based on how closely the easement Scheinberg demanded reflected the easement promised.

But Scheinberg does not make this argument. Instead, he argues that the jury's verdict cannot be construed to be a finding that he failed to make a reasonable demand because the jury was not instructed on conditions and the parties focused their arguments on other elements of the breach-of-contract claim. We acknowledge that it is difficult to know with precision what compelled the jury's verdict since the jury was given little information about the condition element. But as noted above, Scheinberg acquiesced to the verdict form that permitted the jury to find that the County's obligation to perform was not triggered. And in arguing against the trial court's explanation of the verdict, Scheinberg fails to offer another reason that the submission of the interpretation issue to the jury matters.

18

Scheinberg also makes a related argument that reversal of the judgment on the specific-performance and quiet-title claims is required because the trial court erred by interpreting the jury's verdict as a finding that no reasonable demand was made. In ruling on the claim for specific performance, the court relied on the finding that Scheinberg did not make a reasonable demand for performance. Because we reject Scheinberg's challenges to the jury's verdict on the breach-of-contract claim, however, we must reject his challenge to the judgment on the specific-performance claim as well. (See *Golden West Baseball Co. v. City of Anaheim* (1994) 25 Cal.App.4th 11, 49 [specific performance is remedy for breach of contract and is not available unless breach proven].) Furthermore, the court did not rely on the reasonable-demand finding in ruling on the quiet-title claim. Instead, it determined that Scheinberg did not have a "property interest in which title could be quieted." As a result, Scheinberg has offered no reason to disturb the judgment on the quiet-title claim.

> 3.  Any error in instructing the jury on "tender" was harmless.

Finally, Scheinberg argues that the trial court erred by instructing the jury on the concept of tender. This claim is also without merit.

The jury was given a special instruction that provided, "A party may satisfy its obligations under an agreement by tendering performance. [¶] . . . An effective tender has the effect of placing the party to whom the tender is made in default if that person refuses to accept the offer of performance." Scheinberg objected to this instruction on the basis that there was no evidence the County "actually tendered an offer which met its obligations under the dedication agreement."

We need not decide whether the trial court erred in giving this instruction because we agree with the County that any such error was harmless. The issue whether the County had made an effective tender was relevant to the third question on the special-verdict form, which asked whether the County "fail[ed] to do something that the [d]edication [a]greement required it to do and which the Salmon Family Trust demanded that it do"—that is, whether the County had performed its obligations under the dedication agreement. But the jury never reached that question because it found that "the

19

conditions that were required for [the County]'s performance of the [d]edication [a]greement [had not] occurred." Whether the County tendered performance did not bear on whether its obligation to perform had been triggered.

Scheinberg responds that since "the jury received no instructions or argument on the 'condition' issue it purportedly resolved[,] . . . it must have been drawing on the instructions and closing arguments as a whole" to interpret the second question on the verdict form. But he does not identify any way in which the tender instruction might have affected the jury's consideration of the verdict form's second question, and we are unable to perceive one. As a result, his claim fails.

### C. Any Instructional Error Affecting the Claim of Intentional Interference with Contract Was Harmless.

Scheinberg argues that he is entitled to a new trial on the intentional-interference claim because the trial court incorrectly instructed the jury on the element of intent.[6] We disagree.

The trial court instructed the jury, under CACI No. 2201, that two of the elements of the claim of intentional interference with contract were that the County "intended to disrupt performance of [the SRJC-Trust] contract" and that the County's "conduct prevented performance or made performance more expensive or difficult." Next, over Scheinberg's objection, the court gave a special instruction providing that "[c]onduct, as used in Instruction 2201, does not include a failure to grant[,] or delay in granting[,] the easement unless the failure or delay is motivated by the desire to cause the [SRJC] to terminate its agreement with the Salmon Trust." Finally, the court gave CACI No. 2203, which instructed the jury that "[i]n deciding whether [the County] acted intentionally, you may consider whether it knew that a disruption was substantially certain to result

---

[6] Scheinberg argues that he is also entitled to a new trial on the intentional-interference claim because of the alleged inconsistent verdict and instructional errors relating to the breach-of-contract claim, since "[t]he two claims were linked conceptually and in closing arguments to the same underlying questions about the parties' respective rights and who was at fault for SRJC's termination of the deal." Because a new trial on the breach-of-contract claim is not justified for those reasons, they do not justify a new trial on the intentional-interference claim either.

20

from its conduct." The jury answered "Yes" to the first two questions on the special-verdict form, which asked whether there was a contract between the Trust and SRJC and whether the County was aware of that contract. It answered "No" to the third question, which asked whether the County "intend[ed] to disrupt performance of the [SRJC] contract."

Whether a jury instruction is legally correct is a question of law reviewed de novo. (*Mize-Kurzman v. Marin Community College Dist.* (2012) 202 Cal.App.4th 832, 845.) "When a party challenges a particular jury instruction as being incorrect or incomplete, 'we evaluate the instructions given as a whole, not in isolation.' " (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 82.) If an instruction given in a civil case is erroneous, reversal is not justified unless " 'it seems probable' that the error 'prejudicially affected the verdict.' [Citations.]" (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580.) In evaluating prejudice, we consider "not only the nature of the error, 'including its natural and probable effect on a party's ability to place his full case before the jury,' but the likelihood of actual prejudice as reflected in the individual trial record, taking into account '(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled.' " (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 983.)

Initially, we disagree with the County's contention that any error in the special instruction could not have been prejudicial because the jury never needed to apply that instruction. The instruction defined "conduct," a term used for the first time in the verdict form's fourth question: "Did the County of Sonoma's conduct prevent performance, or make performance more expensive or difficult?" Although the jury never reached the fourth question, the term "conduct" was also used in CACI No. 2203. This instruction addressed a verdict question, aimed at the County's intent, that the jury did reach.

Scheinberg contends that the special instruction was erroneous because it required him "to prove that the County's conduct in failing to provide the easement was

21

'*motivated by the desire to cause* [SRJC] to terminate its agreement,' " not just that the County knew that disruption of the contract was substantially certain to occur because of its conduct. (Italics in original.) It is true that the intent element of a claim of intentional interference with contract may be established where " 'the defendant "knows that the interference is certain or substantially certain to occur as a result of his action." ' " (*1-800 Contacts, Inc. v. Steinberg* (2003) 107 Cal.App.4th 568, 586, quoting *Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 56); see also *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1154 [holding that same intent standard applies to claim of intentional interference with prospective economic advantage].) But immediately after hearing the special instruction, the jury was instructed under CACI No. 2203 that "[i]n deciding whether [the County] acted intentionally, you may consider whether it knew that a disruption was substantially certain to result from its conduct." Scheinberg did not and does not challenge the giving of CACI No. 2203, and he fails to explain why that instruction was insufficient to clarify any confusion that the special instruction may have created. His trial counsel argued the "substantially certain to result" standard in closing, and the County's trial counsel did not argue that Scheinberg had to show that the County was "motivated by a desire" to interfere with the SRJC contract. Nor are there any indications that the jury was confused about the appropriate standard of intent to apply in evaluating the intentional-interference claim. Considering the record as a whole, we conclude that even assuming the special instruction was erroneous, it is not probable that the jury was misled to believe Scheinberg had to prove the County had "the desire to cause" termination of the SRJC agreement.[7]

---

[7] In light of this conclusion, we need not consider other issues affecting whether any instructional error was prejudicial. These include whether the County was entitled to a directed verdict on the intentional-interference claim based on discretionary immunity (Gov. Code § 820.2) and, as discussed at oral argument, whether that claim was viable with no underlying breach of contract.

D.       *Juror Misconduct Did Not Prevent Scheinberg from Receiving a Fair Trial.*

Scheinberg argues that he is entitled to a new trial on his claims for breach of contract and intentional interference with contract because of juror misconduct. Again, we disagree.

About two weeks after judgment was entered, Scheinberg moved for a new trial on the basis of juror misconduct. He relied on a declaration filed by his trial counsel attesting to the discovery, after the verdict, of a blog entry posted by a juror during the trial. The entry was posted by the juror on his personal website during Scheinberg's presentation of evidence. It was entitled "Civic Doody" and stated in relevant part:

> "It turns out if you *want* to get chosen for a jury it's super easy! Especially in a civil trial as long as you can quiet your morals and agree that given the weight of the evidence that *in fact* the rock quarry is entitled to the land promised to the orphanage . . . for example. So we're on week three of this stupid trial with at least two more to go. The 'Merchant of Death' trial recently ended after just three weeks but apparently an easement disagreement is far more complex than decades of illegal arms dealing. I can't give any details on the trial, partly because I'm not supposed to, but mainly because I stopped paying attention after day three. I will say it's not like on T.V. and my resentment for everyone I see in that goddamn room every morning is blooming into psychotic rage. Especially Mumbles McLawyer for the plaintiff, Hideous Hairpiece Smoker Guy, and Motherfucking Toothsucking Juror Number Three, AAARRGGGHH!!! Stop it, stop it, stop it!!!!" (Italics in original.)

In opposition to the motion, the County submitted a declaration from the juror, who admitted that the website was his and that he had written the entry. He stated that the blog was "full of rhetoric, sarcasm[,] and hyperbole" and was "meant strictly to be humorous entertainment . . . and [was] not meant to be taken seriously in any sense by anyone at any time." He claimed that, contrary to the impression that the entry might have conveyed, he "took [his] role and job as a juror in this case extremely seriously," paid attention to all the witnesses, evidence, and arguments, and did not discuss the case with others or "make up [his] mind" about the case's outcome until after deliberations had begun. In particular, he characterized his "comment regarding not paying attention during the trial [as] a poor attempt at humor" and claimed he had been "simply hamming

23

it up for [his] intended audience." Scheinberg moved to strike most of the declaration under Evidence Code section 1150 (section 1150) as consisting of inadmissible statements about the juror's "mental processes."

The trial court denied Scheinberg's motion for a new trial. It found that the juror's declaration provided sufficient foundation for admission of the blog entry. It also found that the "activities of the juror in question constituted misconduct" because they violated an instruction given to the jury before trial. That instruction, a modified version of CACI No. 100, stated as follows: "During the trial[,] do not talk about this case or the people involved in it with anyone. . . . [¶] This prohibition is not limited to face-to-face conversation. It extends to all forms of electronic communications. Do not use any electronic device or media, such as a . . . blog . . . or website, including . . . online diaries . . . to send or receive any information to or from anyone about this case or your experience as a juror until you've been discharged from jury duty."

The trial court then considered whether the misconduct was prejudicial. It determined that the "quiet your morals" and "stupid trial" statements did not demonstrate bias against Scheinberg because they were general statements about the need to follow the court's instructions and the juror's frustration with the trial's length. It also determined that both the "stopped paying attention" statement in the blog entry and the portion of the juror's declaration in which the juror stated he *was* paying attention were inadmissible under section 1150. It noted that it had "observed the juror in question continuously throughout the trial" and had never seen "any indication of inattention. In fact, the juror at all times appeared to be interested in the proceedings and carefully following the testimony of witnesses." Finally, it determined that the "psychotic rage" statement aimed at Scheinberg's attorney and another juror was inadmissible under section 1150 because it was "another example of general frustration about the proceedings and [did] not demonstrate a bias against [Scheinberg] or his attorney." Although the blog entry contained "intemperate, insulting, and unacceptable remarks," the court concluded that a new trial was not warranted.

24

Juror misconduct is grounds for granting a new trial. (§ 657, subd. (2).) If misconduct is established, a presumption of prejudice arises. (*People v. Gamache* (2010) 48 Cal.4th 347, 397.) "However, the presumption is not conclusive; it may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct." (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 417 (*Hasson*).) Reversal is not justified unless the misconduct "prevented either party from having a fair trial." (*Enyart v. City of Los Angeles* (1999) 76 Cal.App.4th 499, 507.)

In reviewing the denial of a motion for a new trial on the basis of juror misconduct, "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence. [Citations.] Whether prejudice arose from juror misconduct, however, is a mixed question of law and fact subject to an appellate court's independent determination." (*People v. Nesler* (1997) 16 Cal.4th 561, 582; *Donovan v. Poway Unified School District* (2008) 167 Cal.App.4th 567, 625-626.)

Several forms of potential juror misconduct are at issue here: violation of the prohibition against communications with others about the case; bias and concealment of bias during voir dire; and inattention. We consider each in turn.

1. The posting of the blog entry by the juror was not prejudicial.

We agree with the trial court that the juror's posting of the blog entry constituted misconduct, and the County essentially concedes this point. (§ 611 [jurors have "duty not to . . . disseminate information . . . on any subject of the trial"]; *Bell v. State of California* (1998) 63 Cal.App.4th 919, 930.) As such, a presumption of prejudice arose, and we must therefore consider whether that presumption was effectively rebutted.

Before answering this question, we clarify the scope of our inquiry. After determining that the posting of the blog entry constituted misconduct, the trial court assessed particular statements in the entry to determine whether prejudice resulted. The parties follow a similar analysis in making their arguments on appeal. The appropriate

25

initial focus, however, is on the prejudice resulting from the posting of the blog entry itself—as an outside communication about the case—not on whether the statements in the entry constitute additional forms of misconduct, an issue we consider separately.

We conclude that the record does not reveal any prejudice stemming from the juror's posting of the blog entry. The purpose of the prohibition on outside communications is to ensure, as constitutionally required, an impartial jury that " 'has [not] been improperly influenced [citations] and . . . is " 'capable and willing to decide the case solely on the evidence before it' " [citations].' " (*People v. Harris* (2008) 43 Cal.4th 1269, 1303.) There is no evidence that anyone—aside from the juror himself—saw the blog entry before the verdicts were returned, much less that another juror did. Nor is there any evidence that the entry inspired any outside communication with the juror at issue that might have improperly influenced *him*. As a result, it is not reasonably probable that the posting of the blog entry prevented Scheinberg from receiving a fair trial. (See *Hasson*, *supra*, 32 Cal.3d at p. 417.)

2. The "quiet your morals" and "stupid trial" statements do not establish misconduct.

We next turn to the "quiet your morals" and "stupid trial" statements in the blog entry. The trial court implicitly found that these statements were admissible, and neither party contends otherwise on appeal. We therefore consider whether they demonstrate misconduct and, if so, whether it was prejudicial.[8]

Scheinberg argues that the "quiet your morals" statement alluded to statements the juror made during voir dire and establishes that the juror concealed a bias in favor of the County before being picked for the jury. During voir dire, the juror was asked whether he would have any issues reaching a verdict against the County because it is a governmental entity. He responded, "No, I don't think that it would affect the judgment.

---

[8] Scheinberg also takes issue with the trial court's failure to consider the juror's disparaging remark about another juror, a remark that Scheinberg contends demonstrates that the juror "was unlikely to be open to persuasion during deliberation by" the other juror. We will not consider this remark, however, because the court ruled the statement was inadmissible, and Scheinberg does not claim that ruling was in error.

26

I . . . can see having a problem being upset knowing that maybe money was awarded to a plaintiff, that would be taken from parks, but . . . that wouldn't affect my judgment. . . . You know, if I felt bad that maybe my decision meant it was taking money from parks, I might not like the idea, but I wouldn't let that affect the way I . . . come to judgment."

The "quiet your morals" statement does not demonstrate improper bias or the concealment of bias during voir dire. The juror acknowledged during voir dire that he might be upset by a result in favor of Scheinberg, but only if it resulted in money being taken from parks—an issue not involved in this case. He also agreed that he would not let his personal feelings affect how he reached a decision. The statement on the blog does not suggest that the juror in fact could not put aside his personal beliefs while evaluating the case. We agree with the trial court that, if anything, the statement suggests the juror's compliance with "the court's instruction that jurors must follow the law as stated by the court and not impose their own version of what the law should be."

Scheinberg next argues that the "stupid trial" statement "necessarily implicate[d] the merits of [his] case because [he] had called all the witnesses, and [the juror] was blogging in the middle of [Scheinberg]'s own testimony and targeted [his] counsel for ridicule." He primarily relies on *Andrews v. County of Orange* (1982) 130 Cal.App.3d 944, which held that misconduct justifying a new trial occurred based on statements a juror made while the jury was on "a field trip to inspect . . . homes" that were the subject of inverse-condemnation actions. (*Id.* at pp. 949, 957, 960.) After another juror said, " 'Those people already have enough money, why should they get more?,' " the juror at issue said, " 'This whole thing is a big farce.' " (*Id.* at p. 957.) Later, the juror claimed "he was only expressing his feelings about the jury view of the homes." (*Ibid.*) The Court of Appeal concluded that the statement, whether referring to the trial itself or the jury's trip, showed prejudgment or bias because it suggested the juror "had already made up his mind" and that the proceedings were "therefore a waste of time, a 'big farce.' " (*Id.* at p. 958.)

The "stupid trial" comment here is different from the "big farce" comment in *Andrews v. County of Orange*, *supra*, 130 Cal.App.3d 944 because it did not imply that

the juror prejudged the case.  For the same reason, it is distinguishable from the statements at issue in the other cases Scheinberg cites.  (*Grobeson v. City of Los Angeles* (2010) 190 Cal.App.4th 778, 783, 794, 798 [new trial warranted where juror "stated that she made up her mind during the second week of trial"]; *Deward v. Clough* (1966) 245 Cal.App.2d 439, 441-443 [same where juror stated during trial that he didn't " ' "see why they don't open up the jury room now" ' " because " ' "[w]e could bring in a verdict already" ' "].)  We agree with the trial court that, instead, the comment expresses general frustration with the trial.  It does not establish that the juror was biased against Scheinberg merely because it was made while Scheinberg was putting on his evidence.  And Scheinberg was not exclusively responsible for the trial's length:  although he called most of the witnesses, several of them were hostile witnesses whom the County cross-examined at length and whom the County would have presumably called if Scheinberg had not.

Scheinberg also suggests that the "stupid trial" statement shows the juror concealed his feelings during voir dire.  At the end of voir dire, the County's trial counsel asked the potential jurors whether they had anything to say that they thought "would be important for both parties to know about" that might affect "whether or not [they] could be fair and impartial."  Another potential juror responded, "I'm not the only one who's brought this up.  We're just really confused as to why this trial has to be so long.  Because we've all heard about murder trials that are much shorter, you know. . . .  [I]t seems incredibly frivolous to spend this much time on something to do with pieces of land."  That potential juror was later removed by Scheinberg on a peremptory challenge, and he contends he would also have challenged the juror at issue had he disclosed similar feelings during voir dire.

We question whether the juror at issue could fairly be said to have concealed any information at all.  It is unclear both when the juror arrived at the conclusion that the trial was "stupid" and what was objectionable about it.  It may be that he reached his conclusion well into the proceedings or was expressing his frustration about something other than the trial's length.  And even if we assume the juror was concerned about the

trial's length at the time of voir dire, the other potential juror purported to speak for others as well as herself. At best, the failure to express a similar sentiment after she had spoken constituted unintentional concealment that was "the result of misunderstanding or forgetfulness." (*People v. Jackson* (1985) 168 Cal.App.3d 700, 702, 705 [no misconduct where juror did not volunteer information in response to similar catch-all question on voir dire]; cf. *People v. Diaz* (1984) 152 Cal.App.3d 926, 929-931 [juror who failed to respond to direct question about whether she had been victim of crime similar to that charged should have been discharged].) The juror's "stupid trial" statement did not establish he was biased for the reasons given above, and we therefore conclude that any sentiment about the trial's length he may have failed to disclose during voir dire does not constitute prejudicial misconduct. (See *People v. San Nicolas* (2004) 34 Cal.4th 614, 644 [unintentional concealment not justification for removing juror unless " ' "juror is sufficiently biased to constitute good cause for the court to find . . . that he is unable to perform his duty" ' "].)

3.   The statements involving the juror's level of attention were inadmissible.

Scheinberg next argues that the trial court erred by finding inadmissible the juror's statement that he "stopped paying attention after day three" and that the statement also establishes that a new trial is required. We disagree.

Section 1150, subdivision (a) provides, "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." We review the trial court's determination of admissibility under this statute for an abuse of discretion. (*Barboni v. Tuomi* (2012) 210 Cal.App.4th 340, 345.)

29

Our state Supreme Court considered a similar issue in *Hasson*, *supra*, 32 Cal.3d 388. In that case, the defendant presented declarations from three jurors stating that one juror had read a book and various others had done crossword puzzles while evidence was being presented, and four jurors submitted counterdeclarations stating they had paid attention and denying they had engaged in any activities that prevented them from doing so. (*Id.* at p. 410.) The Supreme Court relied on a previous case interpreting section 1150, subdivision (a) to distinguish " 'between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning process of the individual juror, which can be neither corroborated nor disproved.' " (*Id.* at p. 413.) Under this framework, " '[t]he only improper influences that may be proved under section 1150 to impeach a verdict . . . are those open to sight, hearing, and the other senses and thus subject to corroboration.' " (*Ibid.*) The Supreme Court determined that the counterdeclarations were inadmissible under section 1150 because they constituted "proof of the subjective mental processes of jurors," as opposed to "proof of objectively ascertainable facts" contained in the original declarations. (*Hasson,* at p. 414.) Likewise, the juror's statement here is a description of the juror's subjective mind state, not an overt act, and therefore cannot be corroborated or disproved. (See *id.* at p. 413.) As a result, the trial court properly ruled that the statement was inadmissible.

Scheinberg argues there is a distinction between inadmissible "post-verdict excuses or statements about a juror's prior mental process," which are "inherently unreliable and self-serving," and "pre-verdict admissions about the juror's then-existing state of mind," which he contends "[are] and should be admissible." (Italics omitted.) Section 1150, which applies only after a verdict has been returned (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 72, fn. 10), attempts to balance the need " 'to prevent instability of verdicts, fraud, and harassment of jurors' " with the desire " 'to give the losing party relief from wrongful conduct by the jury.' " (*People v. Hutchinson* (1969) 71 Cal.2d 342, 348.) Certainly, whether a statement is made before or after the verdict may affect some of the policy concerns underlying section 1150. For example, the goal of preventing postverdict jury harassment or tampering is less likely to be undermined by

30

the admission of statements made before a verdict was returned.  But other concerns, such as the finality of verdicts, are just as strong when pre-verdict statements are at issue. Scheinberg fails to convince us that the juror's statement here is admissible merely because it was made during, instead of after, the trial.

In addition, we disagree that the statement itself constitutes misconduct and is therefore admissible.  In *Grobeson v. City of Los Angeles*, *supra*, 190 Cal.App.4th 778, the Court of Appeal held that a juror's statements that she had already made up her mind about the case before deliberations began were admissible under section 1150 because they themselves constituted misconduct. (*Grobeson,* at pp. 788, 790-791.)  Here, however, the statement that the juror stopped paying attention does not indicate that he was biased or that he prejudged the case.  Prejudgment of a case is one reason that a juror might stop paying attention, but the juror's statement did not connect his inattentiveness to his judgment of the case's merits.

Finally, even if we were to conclude that the statement was admissible and established misconduct, the record does not demonstrate prejudice.  " '[A]lthough implicitly recognizing that juror inattentiveness may constitute misconduct, courts have exhibited an understandable reluctance to overturn jury verdicts on the ground of inattentiveness during trial. . . .  Many of the reported cases involve contradicted allegations that one or more jurors slept through part of a trial.  Perhaps recognizing the soporific effect of many trials when viewed from a layman's perspective, these cases uniformly decline to order a new trial in the absence of convincing proof that the jurors were actually asleep during material portions of the trial.' " (*People v. Bradford* (1997) 15 Cal.4th 1229, 1349, quoting *Hasson*, *supra*, 32 Cal.3d at p. 411.)  Here, there is no such "convincing proof."  Indeed, the only objective evidence of the juror's level of attention is the trial court's observation that the juror had paid attention and seemed interested throughout the trial, a factual finding to which we defer.  (See *People v. Nesler*, *supra*, 16 Cal.4th at p. 582.)  We conclude that even if the statement were admissible, it would not justify a new trial.

E.     *The Trial Court Did Not Abuse Its Discretion by Awarding Scheinberg Declaratory Relief.*

In its cross-appeal, the County claims that the trial court's grant of an easement to Scheinberg must be reversed.[9]  The County does not challenge the scope of the easement granted.  Rather, it argues that the findings the trial court made in rejecting Scheinberg's specific-performance claim precluded the court from granting the easement and that two statutes of limitations barred Scheinberg's claim for declaratory relief.  We disagree.

An action for declaratory relief may be brought by "[a]ny person interested . . . under a contract . . . for a . . . determination of any question of construction or validity arising under the . . . contract. . . .  The declaration may be had before there has been any breach of the obligation in respect to which said declaration is sought."  (§ 1060.)  "Declaratory relief generally operates prospectively to declare future rights, rather than to redress past wrongs," and it is therefore used "to declare rights rather than execute them."[10]  (*Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872, 909.)

We review the trial court's decision to grant declaratory relief for an abuse of discretion, although we review de novo any questions of law raised thereby.  (*Carson Citizens for Reform v. Kawagoe* (2009) 178 Cal.App.4th 357, 366.)

As noted above, the trial court rejected Scheinberg's claim for specific performance on the basis that the jury had determined that the County did not breach the

---

[9] The County also cross-appeals from the trial court's denial of its motions for a directed verdict on the breach-of-contract claim as time-barred and the intentional-interference claim as precluded by discretionary immunity but states that we need only reach these issues if we reverse the judgment.  Because we affirm the judgment, we do not consider these issues.

[10] The trial court was acting within its authority not only in determining the scope of the easement but also in ordering the County to grant it.  "An action for declaratory relief is equitable, and a court of equity will administer complete relief when it assumes jurisdiction of a controversy.  [Citation.]  Hence, in such an action it is proper for the court to grant any relief consistent with the evidence and the issues embraced by the pleadings."  (*Westerholm v. 20th Century Ins. Co.* (1976) 58 Cal.App.3d 628, 632, fn. 1; see also *Laurance v. Security-First Nat. Bank* (1963) 220 Cal.App.2d 622, 625-626 [affirming trial court's order of specific performance where plaintiff had only requested declaratory relief].)

dedication agreement because Scheinberg never made a reasonable demand for performance. The finding that Scheinberg never made a reasonable demand was based on evidence that he sought a 70-foot-wide easement without restrictions. As such, that finding also defeated Scheinberg's claim for specific performance, which sought to require the County "to convey . . . the 70-foot[-]wide access easement [without] limitations, conditions[,] or restrictions." (See *Golden West Baseball Co. v. City of Anaheim*, *supra*, 25 Cal.App.4th at p. 49.) The finding did not, however, prevent the court from granting a more limited easement after finding Scheinberg was entitled to one.

The authorities cited by the County do not alter our conclusion. They embody the general principles that a court of equity cannot "create new rights under the guise of doing equity" or "accomplish by indirection what the law forbids to be done directly." (*Marina Tenants Assn. v. Deauville Marina Development Co.* (1986) 181 Cal.App.3d 122, 134; see also *Culbertson v. Cizek* (1964) 225 Cal.App.2d 451, 463; *Shive v. Barrow* (1948) 88 Cal.App.2d 838, 844.) There is no inherent inconsistency between the jury's determination that Scheinberg failed to make a reasonable demand and the conclusion that the dedication agreement gave him a right to a more restricted easement than the one he demanded. None of the decisions cited by the County suggests that the denial of a claim for breach of contract or specific performance of a contract prevents a party from prevailing on an action for declaratory relief involving the same contract. (See *Marina Tenants*, at pp. 132-134 [no viable claim for equitable relief that was "wholly derivative of" plaintiffs' third-party beneficiary claim, which was rejected on the merits]; *Culbertson*, at p. 464 [trial court's determination of amount owed under contract improperly disregarded contract's terms]; *Shive*, at pp. 840, 844-845, 850 [demurrer to claims for equitable relief properly sustained where plaintiffs had adequate alternative remedies at law].)

The County also argues that the trial court erred by granting Scheinberg's claim for declaratory relief because his claim for breach of contract was barred by the statutes of limitations governing actions upon a contract (§ 337) and certain actions "against local public entities." (Gov. Code, §§ 905, 911.2, subd. (a).) There is no independent statute

of limitations governing actions for declaratory relief, and the limitations period does not begin to run until " ' "the obligation in respect to which [the] declaration is sought" ' " has been breached. (*United Pacific-Reliance Ins. Co. v. DiDomenico* (1985) 173 Cal.App.3d 673, 676.)

At the close of evidence, the County moved for a directed verdict on the breach-of-contract claim on the basis that the action accrued when the dedication agreement was signed and was barred by the statutes of limitations. The trial court denied the motion, ruling that a demand for performance was required before the limitations period began to run and refusing to find that Scheinberg's demand was not timely made. The County then withdrew its request for a jury instruction on its statutes-of-limitations defense because it believed the defense was inapplicable if a demand was required before the statutes of limitations began to run. The County's trial counsel later confirmed on the record that the County was no longer pursuing a statutes-of-limitations defense.

On appeal, the County's only explanation for why the breach-of-contract claim was barred is that it "accrued on December 21, 1987, the date the Salmons granted the property to the County by way of the [d]edication [a]greement," and "[t]herefore, the Salmons had to file a complaint by December 21, 1991, four years after the claim accrued." But the trial court rejected this position in denying the motion for a directed verdict, and the County makes no attempt to explain why the court's ruling was erroneous. "Contentions are waived when a party fails to support them with reasoned argument and citations to authority." (*Moulton Niguel Water District v. Colombo* (2003) 111 Cal.App.4th 1210, 1215.) We conclude that the County has waived its argument based on the statutes of limitations.

III.
DISPOSITION

The judgment is affirmed. The parties shall bear their own costs on appeal.

34

_____

Humes, J.[*]

We concur:

_____

Ruvolo, P. J.

_____

Rivera, J.

[*] Presiding Justice of the Court of Appeal, First Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.